UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------
In re:                                              Chapter 11

BRUNO MACHINERY CORPORATION,                        Case No.: 05-20412

                              Debtor.
--------------------------------------------------------------
BRUNO MACHINERY CORPORATION,

                              Plaintiff,            Adv. No.: 07-90028

                v.

TROY DIE CUTTING COMPANY, LLC and
HERBERT CHORBAJIAN, an individual

                              Defendants.
--------------------------------------------------------------

APPEARANCES:

Segel, Goldman, Mazzotta & Siegel, P.C.             Lisa M. Penpraze, Esq.
*Attorneys for Debtor/Plaintiff*
9 Washington Square
Albany, NY 12205

Cooper Erving & Savage LLP                          Phillip G. Steck, Esq.
*Attorneys for Defendants*                          Michael A. Kornstein, Esq.
39 North Pearl Street
Albany, NY 12207

Hon. Robert E. Littlefield, Jr., Chief United States Bankruptcy Judge


## MEMORANDUM-DECISION AND ORDER

On February 13, 2007, the reorganized debtor Bruno Machinery Corporation ("BMC")

commenced the above-captioned adversary proceeding against Troy Die Cutting Company, LLC

("TDC") and Herbert Chorbajian ("Chorbajian") (collectively, the "Defendants") by filing a

complaint (the "Complaint") to avoid certain alleged preferential transfers and fraudulent

conveyances and to recover transferred property pursuant to 11 U.S.C. §§ 544, 547 and 550, and

1

sections 273–276 of the New York Debtor and Creditor Law ("DCL").[1]  (No. 1.)  The

Defendants filed an answer denying the material allegations of the Complaint, asserting

affirmative defenses, and interposing counterclaims for intentional tortious interference with

business operations and conversion.  (No. 5.)

 The Defendants moved for summary judgment pursuant to Federal Rule of Civil

Procedure 56, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure

7056.  (No. 24.)  The court sua sponte denied the motion without prejudice on the basis that the

Defendants failed to comply with the provisions of Local Bankruptcy Rule 7056-1, which

requires the filing of a concise statement of the material facts as to which the moving party

contends there is no genuine issue.  (No. 27.)  The Defendants refiled the motion, which was

denied at the hearing held July 30, 2008.  On consent of the parties, the court granted BMC's

oral application to amend its Complaint to correct typographical errors to include § 548 as a basis

for its second through sixth causes of action.  BMC filed an amended complaint on August 22,

2008.  (No. 46; the "Amended Complaint.")  The Defendants did not file an answer to the

Amended Complaint, and none was required, as the parties agreed that the relevant allegations

had been addressed in the Defendants' original answer.

 A bench trial in this proceeding was held on October 3, 2008, October 6, 2008, October

7, 2008, November 24, 2008, November 26, 2008, and December 3, 2008.  During this six-day

trial, the court received a number of exhibits into evidence and heard testimony from nine

witnesses: Raymond Dufresne; Joao Raquel; Thomas Blair; Ronald Henderson, an expert

witness called by BMC to value the information technology services allegedly provided by BMC

to TDC; Sean Bruno; Robert F. Bruno, Sr.; Herbert Chorbajian; Dr. James Lambrinos, an expert

---

[1] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532.

witness called by BMC to value the managerial services allegedly provided by BMC to TDC;
and Patricia Toftegaard.

At the close of BMC's case, the Defendants moved to dismiss all claims on the basis that
BMC failed to make out a prima facie case.  (Trial Tr. vol. 4, 152, Nov. 24, 2008.)  The court
indicated that it would grant the Defendants' motion to dismiss the claims related to the alleged
provision of managerial services.  (Trial Tr. vol. 5, 21-23, Nov. 26, 2008.)  The Defendants then
proceeded to the presentation of their case.  (Trial Tr. vol. 5, 24, Nov. 26, 2008.)

At the close of the Defendants' case, both parties made oral motions for a "directed
verdict."[2]  (Trial Tr. vol. 5, 108-09, 113, Nov. 26, 2008.)  The court adjourned the motions.  On
the final day of trial, the court granted the Defendants' motion, in part, and denied BMC's
motion.  (Trial Tr. vol. 6, 47-48, Dec. 3, 2008.)  At the same time, the Defendants withdrew their
counterclaims.  (Trial Tr. vol. 6, 46-47, Dec. 3, 2008.)

The court entered a Judgment on Partial Findings dismissing BMC's fraudulent
conveyance claims as regards the provision of managerial services and the subletting of 8,000
square feet of space at a below-market rate.  (No. 104.)  BMC filed a Motion for Retrial pursuant
to Federal Rule of Civil Procedure 59, made applicable to this proceeding by Federal Rule of
Bankruptcy Procedure 9023.  (Nos. 106, 107.)  Following a denial of its Motion for Retrial,
BMC appealed.  (Nos. 117, 118.)  BMC eventually withdrew its appeal because the Judgment on
Partial Findings was not a "final judgment" and as such did not qualify as an appealable order
under Federal Rule of Civil Procedure 54(b).  (No. 142.)

---

[2] While the motions were styled as motions for a directed verdict under Federal Rule of Civil Procedure 50, Rule 50
is only available in jury trials.  Because this was a bench trial, the court construed the motions as motions for a
judgment on partial findings, rather than motions for a directed verdict.  *See* Fed. R. Civ. P. 52(c) ("If a party has
been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may
enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated
only with a favorable finding on that issue.").

The court gave the parties an opportunity to submit post-trial memoranda of law, which the parties accepted, and the matter was submitted for decision.  The court, having heard sworn testimony and arguments of counsel and having considered the parties' pleadings and submissions in this proceeding, makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 157(b)(1), 157(b)(2)(F), 157(b)(2)(H), and 1334.

## FACTS

Prior to bankruptcy, BMC manufactured and sold presses for a variety of industries. BMC also performed die-cutting services for 3M Company ("3M") at BMC's facilities in Troy, New York.  (Trial Tr. vol. 3, 43:21-44:9, Oct. 7, 2008; Trial Tr. vol. 1, 77:19-78:2, Oct. 3, 2008.) Those services were governed by a contract that BMC and 3M renewed annually.  (Trial Tr. vol. 3, 45-46, Oct. 7, 2008.)  Briefly, BMC used a Sheridan mechanical press upon which it mounted cutting dies, supplied by 3M, to cut turn arrows, lane markings, and other reflective decals into materials supplied by 3M.[3]  (Trial Tr. vol. 3, 45:15-17, Oct. 7, 2008.)  At all relevant times, Robert F. Bruno, Sr. ("Bruno") was the majority shareholder and president of BMC.  (Joint Stipulation of Facts (No. 52) ¶¶ 36-37; Trial Tr. vol. 3, 117:15-22, Oct. 7, 2008.)

The events giving rise to this action began in the late-1990s, when BMC spun off its die-cutting business to form Troy Die Cutting, Inc. ("Old TDC"), a separate entity owned by Bruno's two adult sons, Robert F. Bruno, Jr. and Sean Bruno.  (Trial Tr. vol. 4, 57:22-58:5, Nov. 24,

---

[3] T.W. & C.B. Sheridan Co. was a press manufacturer.  (*See* Trial Tr. vol. 1, 87:14-22, Oct. 3, 2008.)  Bruno Machinery acquired the assets and goodwill associated with the manufacture of Sheridan presses, and continued to produce and service the Sheridan press product line.  (Trial Tr. vol. 1, 87:16-88:3, Oct. 3, 2008; Trial Tr. vol. 2, 45:19-46:4, Oct. 6, 2008.)

2008; Trial Tr. vol. 3, 15:18-24, Oct. 7, 2008; Joint Stipulation of Facts ¶¶ 5-6.)  His sons owned

Old TDC, but Bruno retained control and ran the operations.  (Trial Tr. vol. 3, 15:18-24, 157:2-

13, Oct. 7, 2008; Trial Tr. vol. 4, 57:20-58:15, Nov. 24, 2008.)  Old TDC assumed the 3M

contract and operated the die-cutting business in the same capacity as had BMC.  (Trial Tr. vol.

3, 45:1-13, 20:2-5, Oct. 7, 2008.)

Despite the spin-off, BMC and Old TDC were significantly intertwined.  BMC and Old

TDC occupied the same L-shaped building at 1 Madison Street in Troy, New York.  (Trial Tr.

vol. 1, 77:19-78:17, Oct. 3, 2008.)  While the building was divided for separate occupancy, BMC

and Old TDC occupied the same undivided space and shared a common entrance.  (Trial Tr. vol.

1, 79:24-81:7, 78:18-78:22, Oct. 3, 2008; Trial Tr. vol. 3, 157:14-21, Oct. 7, 2008.)  The upper

part of the "L" housed BMC, the lower, Old TDC.  (Trial Tr. vol. 1, 78:8-17, Oct. 3, 2008.)

BMC and Old TDC shared a telephone system; their calls came in through the same switchboard.

(Trial Tr. vol. 1, 78:23-79:16, Oct. 3, 2008.)  Both companies relied on the same, highly

integrated computer system and accounting software.  (Trial Tr. vol. 2, 181:7-21, 185:10-16, Oct.

6, 2008; Trial Tr. vol. 1, 29:17-30:14, Oct. 3, 2008.)  BMC and Old TDC shared utilities, in

BMC's name.  (Trial Tr. vol. 1, 79:17-23, Oct. 3, 2008.)  Old TDC had no employees of its own;

BMC supplied the labor to operate Old TDC.  (Joint Stipulation of Facts ¶¶ 19-20; Trial Tr. vol.

3, 157:14-17, Oct. 7, 2008; Trial Tr. vol. 4, 65:4-11, Nov. 24, 2008.)

In 2000, BMC sought capital to expand and relocate its facilities.  (Trial Tr. vol. 4, 58:21-

59:2, Nov. 24, 2008.)  To this end, Bruno approached his longtime friend Herbert Chorbajian

("Chorbajian") and discussed with him the possibility of acquiring Old TDC.  (Trial Tr. vol. 3,

161:3-10, Oct. 7, 2008; Trial Tr. vol. 4, 42:5-43:8, Nov. 24, 2008.)  Chorbajian was not

interested in personally running the die-cutting business.  (Trial Tr. vol. 3, 161:11-18, Oct. 7,

2008; Trial Tr. vol. 4, 43:9-22, 44:17-45:3, Nov. 24, 2008.)  Instead, he agreed to infuse capital

into BMC by purchasing Old TDC with the understanding that BMC would buy it back at some

point in the future.  (Trial Tr. vol. 4, 46:22-47:5, 64:9-13, Nov. 24, 2008.)  Bruno would sell Old

TDC on behalf of his sons, who agreed to reinvest the proceeds of the sale back into BMC.

(Joint Stipulation of Facts ¶¶ 5-6; Trial Tr. vol. 3, 161:3-10, 164:7-15, Oct. 7, 2008; Trial Tr. vol.

4, 63:1-64:13, Nov. 24, 2008; Def.'s Ex. B.)

    Chorbajian formed TDC to acquire Old TDC.  (Trial Tr. vol. 4, 70:20-71:5, Nov. 24,

2008; Pl.'s Ex. 33; Joint Stipulation of Facts ¶ 7.)  At all relevant times, Chorbajian was the sole

member of TDC.  (Joint Stipulation of Facts ¶ 2.)  On August 1, 2000, Old TDC and TDC

entered into an asset purchase agreement, whereby TDC acquired substantially all of the assets

of Old TDC's die-cutting business for $100,000.  (Joint Stipulation of Facts ¶¶ 4, 7; Trial Tr. vol.

3, 163:1-5, Oct. 7, 2008; Trial Tr. vol. 4, 59:11-14, 61:2-15, 70:20-71:5, Nov. 24, 2008; Pl.'s

Exs. 28, 33–35.)

    BMC agreed to sub-let approximately 8,000 square feet of space to TDC for gross annual

rent of $28,212 on a month-to-month basis.  (Joint Stipulation of Facts ¶ 8; Def.'s Exs. D, E.)

BMC would provide TDC with labor and services, for which BMC would charge TDC an hourly

rate.  (Joint Stipulation of Facts ¶¶ 10-11.)  BMC also agreed to service and maintain TDC's

equipment at no additional charge.  (Joint Stipulation of Facts ¶ 12.)

    TDC agreed to purchase a new $350,000 Bruno hydraulic-mechanical press (the "Bruno

Press") to replace the old Sheridan mechanical press.  (Joint Stipulation of Facts ¶ 9; Pl.'s Ex.1;

Trial Tr. vol. 3, 19:10-20, Oct. 7, 2008; Trial Tr. vol. 1, 88:4-10, 88:18-21, 89:1-90:6, Oct. 3,

2008; Trial Tr. vol. 4, 59:15-19, 61:17-62:21, Nov. 24, 2008; Pl.'s Exs. 28, 33, 38.)  BMC could

use TDC's Bruno Press as a show model, to conduct demonstrations for potential buyers.  (Trial Tr. vol. 3, 163:6-9, Oct. 7, 2008; Joint Stipulation of Facts ¶ 17.)

The upshot was that TDC remained in the same location as BMC and operated Old TDC's die-cutting business in the same capacity as had Old TDC.  (Joint Stipulation of Facts ¶ 31; Trial Tr. vol. 4, 46:18-21, 58:12-20, 65:4-13, 66:17-24, Nov. 24, 2008; Trial Tr. vol. 3, 157:14-158:8, Oct. 7, 2008.)   TDC, like its predecessor, was closely connected to BMC.  This continued connection is the subject of BMC's second through sixth causes of action alleging fraudulent conveyances.

BMC encountered financial difficulties in 2001.  (Trial Tr. vol. 3, 55:14-56:5, 113:11-14, 126:17-128:22, Oct. 7, 2008.)  It had exhausted its lines of credit and was without funds to pay its employees.  (Trial Tr. vol. 3, 55:9-56:5, Oct. 7, 2008.)

On June 5, 2001, Chorbajian made a $300,000 unsecured personal loan to Bruno.  (Joint Stipulation of Facts ¶ 28; Trial Tr. vol. 4, 48:14-19, 50:22-25, 79:9-18, Nov. 24, 2008; Pl.'s Exs. 36, 37; Def.'s Ex. J.)  Chorbajian made the loan to Bruno, as opposed to BMC, to avoid an apparent conflict with Charter One Bank, F.S.B. ("Charter One").[4]  The loan was to be repaid within ninety days, without interest.  (Joint Stipulation of Facts ¶ 29; Trial Tr. vol. 4, 49:21-50:19, 51:3-5, Nov. 24, 2008; Pl.'s Ex. 37.)  Since the making of the loan in 2001, Bruno has repaid $5,000.  (Joint Stipulation of Facts ¶ 30; Trial Tr. vol. 4 51:6-10, Nov. 24, 2008.)  The sole payment sprang from a commission check paid by Chorbajian to Bruno, who endorsed it back to Chorbajian.  (Trial Tr. vol. 4, 51:11-24, Nov. 24, 2008.)  Chorbajian did not engage in collection efforts between 2001 and 2006.  (Trial Tr. vol. 4, 52:9-53:19, Nov. 24, 2008.)

---

[4] Chorbajian was at that time a director of Charter One, which was soliciting BMC as a customer.  (*See* Trial Tr. vol. 4, 40:1-17, 74:18-75:22, Nov. 24, 2008.)

On July 5, 2001, Charter One entered into secured loans with BMC.  (Pl.'s Exs. 53-55.)
Charter One's loan to BMC included three separate extensions of credit: (1) a $750,000.00
Equipment Term Loan; (2) a $500,000.00 Stock Inventory Revolving loan; and (3) a
$750,000.00 A/R Revolving Loan.  (Pl.'s Exs. 53-55.)

Starting in 2001, TDC made a series of loans to BMC to cover BMC's payroll expenses.
(Joint Stipulation of Facts ¶ 24; Trial Tr. vol. 1, 122:24-123:18, Oct. 3, 2008; Trial Tr. vol. 2,
48:25-49:15, Oct. 6, 2008.)  When BMC identified shortfalls in its cash flow, Bruno would
contact Chorbajian for the purpose of obtaining a short-term advance.  (Trial Tr. vol. 1, 123:6-18,
Oct. 3, 2008.)  Chorbajian verbally approved the requests and funds were transferred
accordingly.  (Trial Tr. vol. 1, 123:9-18, Oct. 3, 2008; Trial Tr. vol. 3, 155:9-156:9, Oct. 7,
2008.)  There were no written loan agreements between TDC and BMC for any of the loans.
(Joint Stipulation of Facts ¶ 25; Trial Tr. vol. 1, 123:12-15, Oct. 3, 2008.)

Bruno had the authority to sign checks drawn on TDC's Charter One Bank account.
(Trial Tr. vol. 2, 47:21-23, Oct. 6, 2008.)  BMC introduced into evidence nine checks totaling
$183,595.16, each signed by Bruno, that were drawn on TDC's Charter One bank account and
made payable to BMC.  These checks are as follows:

| Date | Check No. | Amount | Payee |
|------|-----------|--------|-------|
| 12/01/2004 | 10674 | $10,000.00 | Bruno Machinery Corporation |
| 12/29/2004 | 10687 | 15,000.00 | Bruno Machinery Corporation |
| 02/10/2005 | 10712 | 40,000.00 | Bruno Machinery Corporation |
| 03/01/2005 | 10724 | 25,000.00 | Bruno Machinery Corporation |
| 03/29/2005 | 10734 | 25,000.00 | Bruno Machinery Corporation |
| 10/05/2005 | 10847 | 20,000.00 | Bruno Machinery Corporation |
| 10/31/2005 | 10864 | 3,595.16 | Bruno Machinery Corporation |
| 11/02/2005 | 10865 | 20,000.00 | Bruno Machinery Corporation |
| 11/15/2005 | 10871 | 25,000.00 | Bruno Machinery Corporation |
| Total | | 183,595.16 | |

(Pl.'s Exs. 4–8, 10–12.)  BMC also introduced into evidence two checks, signed by Chorbajian, that were drawn on TDC's Charter One bank account.  These checks are as follows:

| Date | Check No. | Amount | Payee |
|---|---|---|---|
| 05/24/2005 | 10769 | $18,000.00 | Bruno Machinery Corporation |
| 11/23/2005[5] | 10872 | 20,000.00 | Herbert Chorbajian |
| Total | | 38,000.00 | |

(Pl.'s Exs. 9, 12.)  Checks numbered 10674, 10734, and 10769 bear the notation "short term."  (Pl.'s Exs. 4, 8, 9.)

In the year prior to its filing, BMC made payments to TDC in the form of checks as well as credits given to TDC against unpaid BMC invoices.  (Joint Stipulation of Facts ¶¶ 26-27.)  The parties stipulate that BMC made thirteen payments during the one-year preference period for a total of $182,864.91.  TDC's notes receivable account, however, shows fifteen payments during the one-year preference period for a total of $195,520.19.  (Def.'s Ex. Q.)  TDC's notes receivable account reads, in relevant part:

| Type | Date | No. | Memo | Amount |
|---|---|---|---|---|
| Deposit | 12/31/2004 | 20567 | short term | -$10,000.00 |
| Deposit | 01/07/2005 | 20568 | short term | -15,000.00 |
| Deposit | 02/18/2005 | 20777 | short term | -40,000.00 |
| Deposit | 03/10/2005 | 20912 | ref short term | -25,000.00 |
| General Journal | 05/31/2005 | #1 | Invoice #19368 | -2,689.70 |
| Deposit | 07/15/2005 | 21373 | repay | -18,000.00 |
| General Journal | 07/19/2005 | PJE1 | Inv 19425, 19421, 19444 | -6,965.58 |
| General Journal | 07/29/2005 | | Inv #19453 | -3,323.73 |
| Deposit | 09/24/2005 | 21912 | short term repay | -10,000.00 |
| Deposit | 10/14/2005 | 22046 | portion short term | -10,000.00 |
| Deposit | 11/02/2005 | 22138 | repay | -20,000.00 |
| General Journal | 11/14/2005 | pje | Inv 19648, 19639, 19659 | -5,360.60 |
| General Journal | 11/28/2005 | | Inv #19690, 19679 | -3,060.49 |
| Deposit | 11/30/2005 | 22216 | repay short term | -25,000.00 |
| General Journal | 12/01/2005 | | Partial Inv #19692 | -1,120.09 |
| Total | | | | -195,520.19 |

---

[5] Deposit date.

(Def.'s Ex. Q.)  It was not apparent which two of the fifteen payments were omitted from the parties' calculations.[6]  The court accepts the parties' stipulation that thirteen payments were made in the year prior to bankruptcy and are the subject of BMC's first cause of action alleging preferential transfers.  (Joint Stipulation of Facts ¶ 27; Amended Complaint ¶¶ 85–90.)  The court, however, finds that the sum of the stipulated payments is $185,864.91, not $182,864.91.

Despite the infusions of cash, BMC continued to experience financial difficulties.  In early 2004, BMC turned to Raymond Dufresne ("Dufresne").  (Trial Tr. vol. 1, 24:18-25:19, Oct. 3, 2008.)  Dufresne, along with Joao Raquel ("Raquel") and Ronald Henderson ("Henderson"), owned Unified Holdings, LLC ("Unified"), a company that provided expertise in the areas of finance, administration, marketing, and information technology.  (Trial Tr. vol. 1, 25:20-26:8, 25:4-14, Oct. 3, 2008.)  Unified acquired a 35 percent equity interest in BMC.  (Trial Tr. vol. 1, 26:9-28:5, Oct. 3, 2008; Trial Tr. vol. 4, 33:12-20, Nov. 24, 2008; Def.'s Ex. M.)  Dufresne served as BMC's Chief Financial Officer and Raquel as its Chief Operating Officer.  (Trial Tr. vol. 1, 28:6-20, Oct. 3, 2008.)  Henderson assessed and updated BMC's computer system.  (Trial Tr. vol. 2, 180:24-190:4, Oct. 6, 2008.)

Notwithstanding Unified's involvement, BMC apparently continued to experience financial difficulties.  By letter dated March 11, 2005, Unified demanded that a special meeting of the shareholders be called to formally consider a plan for rehabilitation of BMC's finances and business operations.  (Pl.'s Exs. 56, 29.)  Unified also demanded that a special meeting of the board of directors be called to set a date for BMC's annual meeting.  (Pl.'s Ex. 29.)

---

[6] Subtracting the stipulated $182,864.91 from the $195,520.19 on the notes receivable account, results in a difference of $12,655.28.  The court identified two of the payments, $2,689.70 and $6,965.58, which, added together, total $9,655.28.  Subtracting this amount from $195,520.19, results in $185,864.91.  The parties offered no explanation for why they omitted the two payments.  The court assumes a scrivener's error for the remaining $3,000.00 difference.

BMC filed a voluntary Chapter 11 bankruptcy petition on December 27, 2005 (the

"Petition Date").  On September 14, 2006, the court directed the United States Trustee to select

and appoint a Trustee pursuant to 11 U.S.C. § 1104.  (Main Case, No. 252.)  The court approved

the appointment of Paul A. Levine, Esq. as the Trustee ("Trustee").  (Main Case, No. 255.)

BMC and Unified filed competing plans of reorganization, with Unified's plan ultimately being

confirmed on October 26, 2006.  (Trial Tr. vol.1, 71:9-12, Oct. 3, 2008; Main Case, Nos. 232,

256, 374.)  The Trustee was discharged and BMC was authorized to operate its business and

manage its property as the reorganized debtor, as well as prosecute avoidance actions.  (Main

Case, Nos. 245, 256, 268, 374.)  BMC commenced the instant adversary proceeding on February

13, 2007.

## ARGUMENTS

As regards the first cause of action, BMC contends that it has met its burden of proving

that the payments made by BMC to TDC meet the preferential transfer requirements under

§ 547(b).  It argues that as a result of the close personal friendship between Chorbajian and

Bruno, TDC and Chorbajian are non-statutory insiders of BMC subject to the one-year reachback

period for avoidance of transfers to insiders.  BMC further argues that the Defendants have failed

to meet their burden of proving any of the statutory defenses of transferees.  As regards the

second through sixth causes of action, BMC argues that it has proven transfers of computer,

labor, and administrative services to TDC and that those transfers meet the fraudulent transfer

requirements under 11 U.S.C. § 548 and DCL sections 273–276.  BMC also seeks an award of

attorney's fees pursuant to DCL section 276-a.  Finally, BMC asserts that the aforementioned

transfers of assets form the basis of Defendants' transferee liability pursuant to 11 U.S.C. § 550.

As regards the first cause of action, the Defendants counter that the payments made by BMC to TDC are not avoidable as preferential in this proceeding because they fail to meet the requirements set forth in § 547(b). The Defendants primarily challenge existence of the second prong, the requirement of an "antecedent debt." The Defendants also contest their status as insiders of BMC. The Defendants alternatively argue that the payments made by BMC to TDC are not avoidable because they fall within the "ordinary course of business" or "new value" defenses under 11 U.S.C. §§ 547(c)(1), (c)(2), and (c)(4). As regards the second through sixth causes of action, the Defendants argue that the alleged transfers were not actually or constructively fraudulent as to creditors. According to the Defendants, the transactions between TDC and BMC were not designed to place BMC's assets outside the reach of creditors, but were merely the result of the contractual arrangement between the parties. The Defendants further argue that BMC failed to prove the value of the alleged transfers or harm to creditors. Finally, the Defendants argue that even if BMC did prove the value of the alleged transfers, it failed to prove a discrepancy between the value of the transfers and the consideration received therefor.

## DISCUSSION

### I.    Preferential Transfers

Paragraphs 85 through 90 of the Amended Complaint contain allegations that in the year leading to its filing, BMC made thirteen transfers to TDC totaling $182,864.91. These alleged transfers were said in the first cause of action to be preferential transfers as described in 11 U.S.C. § 547, in the seventh cause of action to establish transferee liability of TDC pursuant to 11 U.S.C. § 550(a)(1), in the eighth cause of action to establish transferee liability of defendant Chorbajian pursuant to 11 U.S.C. § 550(a)(2), and in the ninth cause of action to allow for recovery of pre-judgment interest from the date of the transfers pursuant to 11 U.S.C. § 547.

Section 547(b) of the Bankrutpcy Code authorizes the avoidance of certain property

transfers made by a debtor within 90 days before bankruptcy.  11 U.S.C. § 547(b)(4)(A).  For

transfers made by a debtor to "insiders," a longer one-year reachback period applies.  *See id.* §

547(b)(4)(B).  The Code makes exceptions, however, for transfers made in the ordinary course of

business and for transfers to creditors who then give new value to the debtor.  *Id.* §§ 547(c)(1),

(c)(2), (c)(4).

### A.  Whether TDC and Chorbajian Are "Insiders" Subject to the One-Year Reachback Period for Avoidance of Transfers to Insiders

The Code lists six statutory insiders of corporations, which include a "director of the

debtor; officer of the debtor; person in control of the debtor; partnership in which the debtor is a

general partner; general partner of the debtor; or relative of a general partner, director, officer, or

person in control of the debtor."  11 U.S.C. § 101(31)(B) (numbering omitted).  In addition to

that list, "courts have identified a category of creditors, sometimes called 'non-statutory

insiders,' who fall within the definition but outside of any of the enumerated categories."

*Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns)*, 554 F.3d 382, 395 (3d Cir. 2009);

*accord Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002)

(collecting cases).  Under the non-statutory analysis, insider status may be based on a

professional or business relationship with the debtor that "compels the conclusion that the

individual or entity has a relationship with the debtor, close enough to gain an advantage

attributable simply to affinity rather than to the course of business dealings between the parties."

*Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 70 (B.A.P. 9th Cir.

1991); *accord DeRosa v. Buildex Inc. (In re F & S Cent. Mfg. Corp.)*, 53 B.R. 842, 848 (Bankr.

E.D.N.Y. 1985).  Courts apply two factors in determining whether a person is a non-statutory

insider: (1) the closeness of the relationship between the debtor and the transferee, and (2)

whether the transactions between the transferee and the debtor were conducted at arm's length.

*In re Tarricone*, 286 B.R. at 262.  "The analysis is a fact intensive one and must be done on a

case-by-case basis."  *Id.* (citations omitted).  Because the Defendants do not fall into one of the

enumerated categories of "insider," the court turns to whether they are non-statutory insiders of

BMC.

### 1.   Closeness of the Relationship Between the Debtor and the Transferee

The Defendants assert that the debtor-creditor relationship at issue in the instant case is

between TDC and BMC, not between Chorbajian and BMC or even between Chorbajian and

Bruno.  (Def.'s Post-Trial Mem. of Law (No. 136) 10.)  In short, the Defendants argue that to

recover on a preference claim the trustee (here, the reorganized debtor) must prove that TDC and

Chorbajian had a close relationship with *the debtor*, and not merely a close relationship with a

statutory insider of the debtor.  The argument finds no support in the statute and has been

rejected in the case law.  *See In re A. Tarricone, Inc.*, 286 B.R. at 263 ("Congress did not limit

the definition of 'insider' to persons having a direct relationship (in addition to the debtor-

creditor relationship) with the debtor.  Since Congress listed as statutory insiders those persons

with a direct relationship to the debtor (i.e., officers, directors and controlling shareholders), it

cannot be supposed that non-statutory insiders must also have a direct relationship redundant of

what is already in subsections (i)-(vi).  Moreover, Section 101(31)(B)(vi) expressly extends

insider status to persons who have no formal relationship at all with the corporate debtor,

namely, relatives of insiders.  Having provided that statutory insiders like relatives need have no

direct relationship to the debtor, there is no reason to suppose that Congress intended a different

rule for non-statutory insiders.").  Thus, the court's inquiry is not limited to the relationship

between TDC and BMC, but extends to the relationships between Chorbajian and Bruno and their respective companies.

TDC had a close relationship with BMC.  Not surprisingly for companies that were run by the same family, Old TDC and BMC had a closer relationship than is normal for unrelated companies.  That relationship continued under Chorbajian's ownership of TDC.  TDC and BMC occupied the same undivided space.  They shared employees and resources.  BMC, through its president, had nearly unfettered authority to write checks drawn on TDC's bank account.  In light of these facts, the court cannot conclude that the relationship between TDC and BMC was anything but close.  The closeness of that relationship is underscored by the longtime friendship between the heads of the two companies.

Chorbajian and Bruno were close personal friends.  (Trial Tr. vol. 4, 42:5-10, Nov. 24, 2008.)  Their friendship spanned over twenty-five years.  (Trial Tr. vol. 4, 42:5-10, Nov. 24, 2008.)  The two ate breakfast together as often as three times per month, their sons played youth hockey together, and their families took vacations together.  (Trial Tr. vol. 4, 42:11-23, 57:2-15, Nov. 24, 2008.)  Based upon the foregoing, the court finds that both TDC and Chorbajian had close relationships with Bruno and BMC.

## 2.  Whether the Transactions Were Conducted at Arm's Length

Here, the close relationships between Chorbajian, Bruno, and their respective companies do not stand alone, but are coupled with less-than-arm's-length transactions.  Arm's-length transactions have been defined as transactions "between two unrelated and unaffiliated parties" or "between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflicts of interest arise."  Black's Law Dictionary 1635 (9th ed. 2009).

Chorbajian's purchase of Old TDC was not an arm's-length transaction.  Chorbajian performed little or no due diligence when purchasing Old TDC.  Chorbajian believed that Old

TDC had only one customer, 3M.  (Trial Tr. vol. 4, 58:6-15, 63:8-9, Nov. 24, 2008.)  Yet,

Chorbajian did not review the 3M contract prior to purchasing Old TDC.  (Trial Tr. vol. 4, 46:6-

17, Nov. 24, 2008.)  Nor was the contract listed as an "assigned contract" in the Asset Purchase

Agreement.  (*See* Def.'s Ex. B.)  While Bruno's sons were the record owners of Old TDC, Bruno

orchestrated the sale and directed its proceeds.  Bruno retained control and ran the day-to-day

operations of TDC.

Chorbajian's $300,000 loan to Bruno was not an arm's-length transaction.  While the

loan was personal, in form, it was in fact used for business purposes.  Concerning the loan,

Chorbajian testified:

> Q    Okay.  Now, Mr. Steck referred you to page 65 in your deposition
> transcript regarding the $300,000 loan to Mr. Bruno.
>
> A    Okay.
>
> Q    I just want to ask you a question about that. You said when Mr. Steck
> asked you you said that the loan was for the Bruno Machinery business,
> right?
>
> A    Yes.
>
> Q    Is there a reason why the loan wasn't made directly to Bruno Machinery?
>
> A    Well, I'm not sure - - yes to answer your question.  I'm not sure of the
> timing, but I know that Charter One was soliciting the Bruno Machinery
> account.  Bruno Machinery was a customer of Troy Savings Bank.  And
> ultimately Charter One did get the account.  I'm not sure of the timing of
> all this, if they had it at that time or didn't have it at that time.  But I in my
> own mind did not want it to appear that I was competing with the bank for
> a potential loan.  That's why I didn't and I explained this all to the local
> guy that was soliciting Bruno Machinery as a customer.  I said to him, I
> said, you know, here's what I'd like to do, I'm not going to lend it to the
> company, maybe it's going in the company, maybe it's - - to me it was
> important - - it was an important distinction not to lend it directly to the
> company, okay.  I said if you don't want me to do this I won't do it.  He
> said no, that's fine, go ahead and do it and that's why I lent it to Bob
> Bruno and not to the company.

(Trial Tr. vol. 4, 74:18-75:22, Nov. 24, 2008.)  Chorbajian testified candidly that $300,000 "was

a little more than [he] had in mind," but that he made the loan "fully expecting to be paid back in

90 days." (Trial Tr. vol. 4, 50:8, 50:13-15, Nov. 24, 2008.)  Chorbajian made the loan on an

unsecured basis, without inquiring into Bruno's or BMC's ability to repay it.  The only

reasonable explanation for this seemingly careless decision by Chorbajian, a highly sophisticated

business man with close to fifty years of experience in the accounting and banking industries, is

that he made the loan because of his relationship with Bruno.  The loan was not repaid within

ninety days.  The sole payment on the loan was made in an unusual form, with Chorbajian

issuing a check to Bruno, and Bruno endorsing the check back to Chorbajian.  Chorbajian's

casual reaction to Bruno's default further points to the non-commercial nature of the transaction.

The transfers of funds from TDC to BMC to pay BMC's monthly expenses were not

arm's length transactions.  TDC made the transfers on an unsecured basis.  They were made at a

time when BMC had exhausted all other available lines of credit.  The transfers were based on

oral agreements between Bruno and Chorbajian; none were memorialized in writing.  Moreover,

the transfers have all the indicia of a non-arm's-length transaction, in which the borrower and

lender could be viewed as sitting on both sides of the table.  BMC's president, Bruno, had the

authority to sign checks for TDC.  He used that authority to effectuate the transfers.  While

Chorbajian, as the sole owner of TDC, had the technical authority to grant or deny Bruno's

requests for funds, the requests were routinely granted.

The closeness of the relationship between Chorbajian and Bruno, the unusual nature of

their business transactions, and the general lack of formality surrounding these transactions lead

the court to conclude that both Chorbajian and TDC are non-statutory insiders of BMC.

### 3.   Control not Necessary

The Defendants assert that BMC failed to prove that either TDC or Chorbajian exercised

"control" over BMC, and that a finding of control is necessary for a determination that the

Defendants were non-statutory insiders, citing *Anstine v. Carl Zeiss Meditec AG (In re U.S.*

*Medical, Inc.)*, 531 F.3d 1272 (10th Cir. 2008).  (Def.'s Post-Trial Mem. of Law 10–12.)  The

Defendants misapprehend the Tenth Circuit's holding in *U.S. Medical* insofar as they suggest it

requires "control" as an element in determining insider status.  *U.S. Medical* held "that a creditor

may only be a non-statutory insider of a debtor when the creditor's transaction of business with

the debtor is not at arm's length."  *Id.* at 1280.  That holding did not rest on a finding of control.

The Tenth Circuit simply said that the bankruptcy court erred in holding that a creditor was a

non-statutory insider of the debtor—based solely on the closeness of the relationship between the

creditor and debtor—without any finding that the transactions between the creditor and debtor

"were not at arm's length *or* that there was undue influence or control" by the creditor.  *Id.* at

1278 (emphasis added).

Here, unlike in *U.S. Medical*, the court finds that the parties engaged in less-than-arm's-

length transactions.  Therefore, the court need not reach the alternative element of control.  The

court declines the Defendants' invitation to add "control" as a separate and additional element in

determining insider status.  In doing so, the court aligns itself with the other decision in this

Circuit that has addressed the question.  *See In re A. Tarricone*, 286 B.R. at 264–65.  As

reasoned in *Tarricone*:

> Where Congress intended control to be an element in determining insider
> status, it was specified in the statute.  Only two of the sub-categories in Section
> 101(31) require a finding of control by the person who is to be held an insider.
> *See* Section 101(31)(B)(iii) and (C)(v).  It is self-evident that most directors
> (subsection (i)) and subordinate officers (subsection (ii)) of the debtor do not
> exercise "control" over the debtor, much less do relatives of officers and directors
> (subsection (vi)).  Nor is it necessary to find that a statutory insider with whom a
> creditor has a close personal relationship . . . has a position of control over the
> debtor.  If it were not abundantly clear from subsections (i)-(v), only one of which
> requires control, the disjunctive in subsection (vi) denominating as an insider a
> relative of a general partner, officer, director "*or* person in control of the debtor"
> puts it beyond argument that Congress did not make control necessary for either
> statutory or non-statutory insider status. The nature of the relationships listed in
> all of the subparts of Section 101(31) are such that influence can be assumed, and

it is therefore unnecessary to prove that there is actual control if such a relationship has been established.

*Id.* (citing *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 69–70 (B.A.P. 9th Cir. 1991) ("the Code assigns insider status to entities or relatives of the debtor, or of persons in control of a related entity, whose affinity or consanguinity gives rise to a conclusive presumption that the individual or entity commands preferential treatment by the debtor.")).

To summarize, the Defendants had a close relationships with BMC.  Those relationships, coupled with the fact that Chorbajian and Bruno, both individually and through their respective companies, engaged in less-than-arm's length transactions, make TDC and Chorbajian non-statutory insiders of BMC.  Accordingly, both TDC and Chorbajian are subject to the one-year reachback period of § 547(b)(4)(B).

### B.  Whether the Payments Made by BMC to TDC Meet the Conditions for Avoidable Preferential Transfers under 11 U.S.C. § 547(b)

Section 547(b) sets forth the elements for preferential transfers and provides that the trustee (or, in this case, the reorganized debtor) may avoid any transfer of an interest of the debtor in property:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title . . . .

11 U.S.C. §§ 547(b)(1)-(5), 1107(a),[7] 1123(b)(3)(B).[8]  BMC bears the burden of proving the five

elements of a preferential transfer, which it must do by a preponderance of the evidence.  *See* 11

U.S.C. § 547(g).  Once it has been shown that there was a preferential transfer, the burden then

shifts to the Defendants, who must prove one of the statutory defenses.  *Gold Force Int'l, Ltd. v.

Official Comm. of Unsecured Creditors of Cyberrebate.com*, No. 03 CV 5982, 2004 WL 287144,

at *3 (E.D.N.Y. Feb. 10, 2004).

Applying the five elements to the present case, the court finds little doubt that the

transfers were made to TDC, then a creditor of BMC, and were made within one year of BMC's

filing under Chapter 11.  (*See* Def.'s Ex. P; Joint Stipulation of Facts ¶¶ 18, 26-27.)  The

Defendants challenge the second element to the extent that they contest the timing and payments

of the loans.  (Def.'s Pre-Trial Statement (No. 54) ¶ 8; Def.'s Post-Trial Mem. of Law 16-17, 26-

28.)  From the outset, the court notes "that the 'antecedent debt' requirement of § 547(b)(2) and

the 'contemporaneous exchange' exception of § 547(c)(1)—although often treated as opposite

sides of the same coin—present two analytically separate inquiries."  *Baker Hughes Oilfield

Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 398 (5th Cir. 2005) (citation

omitted).  "The former is an element of avoidability; the latter is an exception—that is, an

affirmative defense—to avoidability.  It is therefore possible that a given transaction might be

---

[7] Section 1107(a) provides, in relevant part:

> (a) Subject to any limitations on a trustee serving in a case under this chapter, and to such
> limitations or conditions as the court prescribes, a debtor in possession shall have all the rights . . .
> and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under
> this chapter.

11 U.S.C. § 1107(a).

[8] The Chapter 11 plan in the main case provided for the post-confirmation retention and enforcement of various
claims existing in favor of the debtor or the estate, including preference and fraudulent conveyance claims.

one or the other, neither, or both." *Id.* Accordingly, the court considers the two issues

separately.[9]

### 1. The Transfers Were Made in Connection with Antecedent Debts Incurred by BMC

Under § 547(b)(2), "a debt is antecedent if the debtor incurs it before making the alleged

preferential transfer." *Creditor Trust v. Harari (In re G. Survivor Corp.)*, 217 B.R. 433, 440

(Bankr. S.D.N.Y. 1998) (collecting cases). TDC and BMC maintained a running notes

receivable account. (Def.'s Exs. P, Q.) In each instance, the payments made by BMC were

applied as credits to prior debits on the account. (*See* Def.'s Exs. P, Q; Trial Tr. vol. 1, 143:18-

145:16, Oct. 3, 2008.) Therefore, the court finds that BMC has met its burden of proving the

second element, that the transfers were made for or on account of antecedent debts. The court

turns to the remaining two elements.

### 2. The transfers were made while BMC was insolvent.

The Code defines insolvency as the financial condition in which "the sum of [an] entity's

debts is greater than all of such entity's property." 11 U.S.C. § 101(32)(A). The debtor is

presumed to have been insolvent during the 90 days prior to the Petition Date. 11 U.S.C.

§ 547(f). For the period between 90 days and one year prior to the Petition Date, courts apply a

"balance sheet test" that looks to whether the debtor's assets were exceeded by its liabilities at

the time of the transfer. *See Nugent v. First Am. Bank*, No. 91-CV-1410, 1992 WL 200635, at *2

(N.D.N.Y. Aug. 12, 1992); *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d Cir. 2006); 5-547

Collier on Bankruptcy ¶ 547.03 (16th ed. 2009). Because of "the difficulty in valuing the assets

and liabilities of a debtor on the exact date of a preferential transfer," courts use "the well-

established bankruptcy principles of 'retrojection' and 'projection,' which provide for the use of

---

[9] *See infra* Parts I.B.1 and C.2.

evidence of insolvency on a date before and after the preference date as competent evidence of the debtor's insolvency on the preference date." *Coated Sales, Inc. v. Glantz (In re Coated Sales, Inc.)*, 144 B.R. 663, 666 (Bankr. S.D.N.Y. 1992) (citations omitted).

Both witness testimony and documentary evidence establish that BMC was insolvent from as early as 2001 and continued to be insolvent through the Petition Date. The Defendants called as a witness Patricia Toftegaard ("Toftegaard"), who was employed in BMC's accounting department during the relevant time period. (Trial Tr. vol. 5, 24:19-25:16, Nov. 26, 2008.) Toftegaard testified that she used the computer program QuickBooks to maintain the books and records of BMC. (Trial Tr. vol. 5, 27:1-12, Nov. 26, 2008.) BMC introduced into evidence Exhibits 21-A and 21-C, which contain printouts of BMC's financial statements, from the QuickBooks database, for the period of March 1, 2000 through December 31, 2005.[10]

After review of the testimony, balance sheets, and other financial documents, the court finds that in the years leading to the Petition Date, BMC's liabilities exceeded its assets by substantial amounts. On February 28, 2002, liabilities exceeded assets by $481,340.68. (Ex. 21-C; Trial Tr. vol. 4, 7:11-8:17, 8:22-10:3, Nov. 24, 2008.) On February 28, 2003, liabilities exceeded assets by $1,415,116.64. (Ex. 21-C; Trial Tr. vol. 4, 13:1-6, Nov. 24, 2008.) On February 28, 2004, liabilities exceeded assets by $3,556,951.34. (Ex. 21-C; Trial Tr. vol. 4, 13:1-6, Nov. 24, 2008.) On February 28, 2005, liabilities exceeded assets by $5,936,971.67. (Ex. 21-A; Trial Tr. vol. 1, 58:3-14, Oct. 3, 2008.) On December 31, 2005, liabilities exceeded assets by $6,644,354.07. (Ex. 21-A; Trial Tr. vol. 1, 55:13-24, 56:18-57:16, Oct. 3, 2008.)

---

[10] Exhibit 21-A was received into evidence at trial. (*See* Trial Tr. vol. 1, 42:15-16, 50:12-24, Oct. 3, 2008.) Defense counsel objected to the introduction of Exhibit 21-C on the grounds that it was inadmissible hearsay. (*See* Trial Tr. vol. 1, 35:8-19, Oct. 3, 2008.) The court sustained the objection and BMC reserved an exception. (Trial Tr. vol. 1, 50:12-24, 205:8-16, Oct. 3, 2008.) Following submissions by the parties, the court issued an oral decision and order allowing the admission of Exhibit 21-C under the business records exception to the hearsay rule. (Nos. 74, 79, 83.)

Based upon the foregoing, BMC was continuously insolvent from at least 2001 to the

Petition Date.  Therefore, the court finds that BMC has met its burden of proving the third

element, that that the transfers were made while BMC was insolvent.

### 3. The Transfers Enabled TDC to Receive More than it Would Have Received Under a Hypothetical Chapter 7 Liquidation

For purposes of the hypothetical Chapter 7 liquidation, the court looks at the debtor's

condition at the time of the filing of the petition.  Where the distribution in bankruptcy would

yield less than 100 percent, "any payment 'on account' to an unsecured creditor during the

preference period will enable that creditor to receive more than [it] would have received in

liquidation had the payment not been made."  *Waslow v. Transworld Mktg. Corp. (In re M*

*Group, Inc.)*, 308 B.R. 697, 700 (Bankr. D.Del. 2004).  In this case, a hypothetical Chapter 7

liquidation would have resulted in little or no distribution to unsecured creditors like TDC.  (*See*

Trial Tr. vol. 1, 74:11-76:22, Oct. 3, 2008; First Amended Disclosure Statement of Unified

Holdings, LLC (Main Case No. 245) 25–26.)  TDC, however, received at least $185,864.91.

Therefore, the court finds that BMC has met its burden of proving the final element.  Because

BMC has met its burden of proving all the elements of an avoidable transfer under § 547(b), the

burden shifts to the Defendants to prove, by a preponderance of the evidence, the nonavoidabilty

of the transfers under § 547(c).  *See* 11 U.S.C. § 547(g); *Lawson v. Ford Motor Co. (In re*

*Robling Indus., Inc.)*, 78 F.3d 30, 39 (2d Cir. 1996); *Gold Force Int'l, Ltd. v. Official Comm. of*

*Unsecured Creditors of Cyberrebate.com*, 2004 WL 287144, at *3 (E.D.N.Y. Feb. 10, 2004).

### C. Whether the Payments Made by BMC to TDC Are Exempt from Avoidance under 11 U.S.C. § 547(c)

Section 547(c) sets forth exceptions which, if applicable, preclude the avoidance of a

transfer even if the transfer meets the conditions for avoidable preferential transfers under

§ 547(b).  The Defendants raise two such exceptions in this case.  The first, found in § 547(c)(2),

23

is known as the "ordinary course of business" defense.  The second, found in § 547(c)(4), is

known as the "subsequent new value" defense.  The court considers each in turn.

### 1.  Ordinary Course of Business Defense

The purpose of  the ordinary course of business exception "'is to leave undisturbed

normal financial relations, because it does not detract from the general policy of the preference

section to discourage unusual action by either the debtor or his creditors during the debtor's slide

into bankruptcy.'"  *Official Comm. of Unsecured Creditors of Cyberrebate.com, Inc. v. Gold*

*Force Int'l, Ltd. (In re Cyberrebate.com, Inc.)*, 296 B.R. 639, 642 (Bankr. E.D.N.Y. 2003)

(quoting H.R. Rep. No. 95-595, at 373 (1977), S.R. No. 95-989, at 88 (1977), *reprinted in* 1978

U.S.C.C.A.N. 5787, 5874, 6329).  Consistent with this purpose, § 547(c)(2) provides that a

transfer cannot be avoided to the extent that it "was in payment of a debt incurred by the debtor

in the ordinary course of business or financial affairs of the debtor and the transferee, and [it]

was made in the ordinary course of business or financial affairs of the debtor and the transferee;

or made according to ordinary business terms."  11 U.S.C. § 547(c)(2) (numbering omitted).

BMC filed its bankruptcy petition in the main case on December 27, 2005, after the

October 17, 2005 general effective date for the Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005 ("BAPCPA").  "Significantly, BAPCPA amended § 547(c)(2) by

changing the 'and' between subsections (B) and (C) to 'or,' thus making the prongs alternative

and easier for preference defendants to make out an ordinary course defense."  *Rifken v. Entec*

*Distribution, LLC (In re Felt Mfg. Co.)*, Ch. 11 Case No. 05-13724, Adv. No. 07-1170, 2009 WL

3348300, at *6 n.16 (Bankr. D.N.H. Oct. 16, 2009).  Thus, to make out an ordinary course of

business defense, the Defendants must show that the incurred debts, and the resulting transfers in

payment of those debts, were made either in the ordinary course of business *or* according to

ordinary business terms.  *See* 11 U.S.C. § 547(c)(2).  The transfers here were not made according

to ordinary business terms.  At issue is whether the transfers were made in the ordinary course of

business of BMC and TDC.  Section 547(c)(2)(A) "requires a subjective examination of whether

a transfer was ordinary between the parties to the transfer, meaning whether the payments were

consistent with the course of dealings between the particular parties."  *See McCarthy v. Navistar*

*Fin. Corp. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27, 34 (N.D.N.Y. 1997), *aff'd*, 142 F.3d

571 (2d Cir. 1998) (internal quotation marks and citations omitted).

The Bankruptcy Code does not define the phrases "ordinary course of business" and

"ordinary business terms."  As a result, courts have considered several factors in determining the

availability of the ordinary course of business defense, including: "(i) the prior course of dealing

between the parties, (ii) the amount of payment, (iii) the timing of payments, (iv) circumstances

surrounding the payments, (v) the existence of any unusual debt collection practices, and (vi)

changes in the means of payment."  *See Official Comm. of Unsecured Creditors of 360networks*

*(USA) Inc. v. U.S. Relocation Servs., Inc. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 210–11

(Bankr. S.D.N.Y. 2005) (collecting cases).

### i.    Prior Course of Dealing Between the Parties

To prove ordinariness, the Defendants "had to establish a 'baseline of dealings,' and

show that the transfers were consistent with the parties' prior course of dealings."  *See Savage &*

*Assocs., P.C. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 344 (Bankr. S.D.N.Y. 2008) (citation

omitted).  BMC and TDC maintained an open notes receivable account, against which credits

and payments were applied on a highly irregular basis.  It was incumbent upon the Defendants to

show "some similarity in the account aging history in preference period and that in the pre-

preference period."  *See Waslow v. Interpublic Group of Cos., Inc. (In re M Group, Inc.)*, 308

B.R. 697, 702 (Bankr. D. Del. 2004).  Yet the Defendants did not show that the preference period

notes and repayments were consistent, in amount and timing, with those made prior to the

preference period.

The court gives no weight to the "memo" column of Exhibits P and Q, purporting to

apply certain payments to specific advances, or to the Defendants' assertions to this effect.

(Def.'s Exs. P, Q; Def.'s Post-Trial Mem. of Law 15–18.)  Both are contradicted by the

testimony at trial, which established that the parties kept a running account and that all of the

advances and repayments were "on account."  (Trial Tr. vol. 1, 127:1-8; 131:14-23, Oct. 3, 2008;

Trial Tr. vol. 5, 84:20-24, 101:23-102:1, Nov. 26, 2008; *see* Def.'s Post-Trial Mem. of Law 26.)

It is well established that where a "credit merely appears in the general account and there is no

evidence of any understanding to the contrary, the credit will be considered as applied to debits

in the order of time in which the debits occurred."  *See In re Weese*, No. DT 09-09268, 2010 WL

1731668, at *4 (Bankr. W.D. Mich. Apr. 28, 2010) (citations omitted); *accord In re Stacy, Wolf

Hat Co.*, 99 F.2d 793, 794 (2d Cir. 1938) ("if a debtor does not specify how his payment is to be

applied, the creditor may apply it as he pleases, and, if neither party makes any specific

application, the presumption is that the oldest debt is to be first paid"); *see also Maryland Cas.

Co. v. Bd. of Water Comm'rs of Dunkirk*, 66 F.2d 730, 738 (2d Cir. 1933); *Burns v. Stento*, 9

N.Y.S.2d 736, 742–43 (N.Y. Co. Ct. 1939); *Beyer Bros. of Long Island Corp. v. Kowalevich*,

454 N.Y.S.2d 444, 445 (2d Dep't 1982); *In re Earl*, 147 B.R. 60, 66–67 (Bankr. N.D.N.Y. 1992).

The examples offered by the Defendants are self-serving, inaccurate, and largely irrelevant to

establishing a baseline of dealings between the parties.  (*See* Def.'s Post-Trial Mem. of Law 15–

18.)  The Defendants argue, without analysis, "that the overall methodology and pattern of the

transactions was the same."  (Def.'s Post-Trial Mem. of Law 18.)  Taken to its logical

conclusion, the Defendants' presentation would allow *any* payment, whether it comes one day,

one month, or even a year after the note, to be ordinary.  This is not what Congress envisioned

when it enacted § 547.  In short, the Defendants wholly failed to prove their defense.  This

failure of proof, in itself, dooms the ordinary course of business defense.

The Defendants' manner of proof, only by example—without providing an aging history

of the notes receivable account either in testimony, evidence, or in the post-trial briefing—has

made the court's review of the evidence difficult and time consuming.  Notwithstanding the

deficiencies in the Defendants' proof, and in the interest of finality, the court has undertaken an

independent review of the exhibits to have some basis for comparing the preference period

payments to those made prior to the preference period.

Table 1, based upon Exhibits P and Q in the record, illustrates the time elapsed between

note date and payment date.  For ease of discussion, payments made during the preference period

have been numbered 1 through 15.

*Table 1*

| Payment Number | Payment Date | Payment Amount | Split | Notes Receivable | Note Date | Payment Date | Time between Note & Payment (Days) |
|---|---|---|---|---|---|---|---|
| | | | | **15,000.00** | **06/28/01** | | |
| | 02/25/02 | 2,351.00 | | 12,649.00 | | 02/25/02 | 242 |
| | 02/28/02 | 1,336.40 | | 11,312.60 | | 02/28/02 | 245 |
| | 03/15/02 | 2,351.00 | | 8,961.60 | | 03/15/02 | 260 |
| | 03/22/02 | 1,287.46 | | 7,674.14 | | 03/22/02 | 267 |
| | 04/01/02 | 1,298.75 | | 6,375.39 | | 04/01/02 | 277 |
| | 04/01/02 | 2,351.00 | | 4,024.39 | | 04/01/02 | 277 |
| | 04/18/02 | 1,450.93 | | 2,573.46 | | 04/18/02 | 294 |
| | 05/03/02 | 2,351.00 | | 222.46 | | 05/03/02 | 309 |
| | | | 222.46 | 0.00 | | 05/03/02 | 309 |
| | 05/03/02 | 964.08 | | **5,000.00** | **08/08/01** | | |
| | | | 741.62 | 4,258.38 | | 05/03/02 | 268 |
| | 05/22/02 | 3,097.58 | | 1,160.80 | | 05/22/02 | 287 |
| | | | 1,160.80 | 0.00 | | 06/30/02 | 326 |
| | 06/30/02 | 32,000.00 | | **8,200.00** | **09/27/01** | | |
| | | | 8,200.00 | 0.00 | | 06/30/02 | 276 |

| Payment Number | Payment Date | Payment Amount | Split | Notes Receivable | Note Date | Payment Date | Time between Note & Payment (Days) |
|---|---|---|---|---|---|---|---|
| | | | | **32,000.00** | **06/26/02** | | |
| | | | 22,639.20 | 9,360.80 | | 06/30/02 | 4 |
| | 07/09/02 | 5,851.54 | | 3,509.26 | | 07/09/02 | 13 |
| | 07/22/02 | 3,509.26 | | 0.00 | | 07/22/02 | 26 |
| | | | | **10,779.50** | **07/22/02** | | |
| | 07/22/02 | 1,348.47 | | 9,431.03 | | 07/22/02 | 0 |
| | 07/29/02 | 2,144.11 | | 7,286.92 | | 07/29/02 | 7 |
| | 08/12/02 | 5,153.90 | | 2,133.02 | | 08/12/02 | 21 |
| | 08/12/02 | 2,133.02 | | 0.00 | | 08/12/02 | 21 |
| | | | | **20,000.00** | **08/27/02** | | |
| | 09/30/02 | 3,874.00 | | 16,126.00 | | 09/30/02 | 34 |
| | 10/15/02 | 6,066.42 | | 10,059.58 | | 10/15/02 | 49 |
| | 10/30/02 | 1,750.21 | | 8,309.37 | | 10/30/02 | 64 |
| | 11/05/02 | 3,518.99 | | 4,790.38 | | 11/05/02 | 70 |
| | 11/25/02 | 575.09 | | 4,215.29 | | 11/25/02 | 90 |
| | | | 4,215.29 | 0.00 | | 12/13/02 | 108 |
| | | | | **750.00** | **10/25/02** | | |
| | 12/13/02 | 10,000.00 | 750.00 | 0.00 | | 12/13/02 | |
| | | | | **20,000.00** | **11/07/02** | | |
| | | | 5,034.71 | 14,965.29 | | 12/13/02 | 36 |
| | 12/30/02 | 1,394.25 | | 13,571.04 | | 12/30/02 | 53 |
| | 01/15/03 | 10,000.00 | | 3,571.04 | | 01/15/03 | 69 |
| | | | 3,571.04 | 0.00 | | 01/28/03 | 82 |
| | 01/28/03 | 5,000.00 | | **10,000.00** | **12/10/02** | | |
| | | | 1,428.96 | 8,571.04 | | 01/28/03 | 49 |
| | 03/28/03 | 6,013.36 | | 2,557.68 | | 03/28/03 | 108 |
| | | | 2,557.68 | 0.00 | | 04/25/03 | 136 |
| | 04/25/03 | 9,000.00 | | **15,000.00** | **01/14/03** | | |
| | | | 6,442.32 | 8,557.68 | | 04/25/03 | 101 |
| | 04/28/03 | 3,295.67 | | 5,262.01 | | 04/28/03 | 104 |
| | | | 5,262.01 | 0.00 | | 05/09/03 | 115 |
| | | | | **15,000.00** | **02/04/03** | | |
| | 05/09/03 | 60,000.00 | 15,000.00 | 0.00 | | 05/09/03 | 94 |
| | | | | **69,000.00** | **04/22/03** | | |
| | | | 39,737.99 | 29,262.01 | | 05/09/03 | 17 |
| | 05/30/03 | 1,803.41 | | 27,458.60 | | 05/30/03 | 38 |
| | 07/28/03 | 2,373.63 | | 25,084.97 | | 07/28/03 | 97 |
| | 09/30/03 | 1,461.02 | | 23,623.95 | | 09/30/03 | 161 |
| | 01/13/04 | 22,000.00 | | 1,623.95 | | 01/13/04 | 266 |
| | | | 1,623.95 | 0.00 | | 03/18/04 | 331 |
| | 03/18/04 | 10,000.00 | | **10,000.00** | **08/15/03** | | |
| | | | 8,376.05 | 1,623.95 | | 03/18/04 | 216 |

| Payment Number | Payment Date | Payment Amount | Split | Notes Receivable | Note Date | Payment Date | Time between Note & Payment (Days) |
|---|---|---|---|---|---|---|---|
| | | | 1,623.95 | 0.00 | | 03/18/04 | 216 |
| | 03/18/04 | 2,381.00 | | **8,000.00** | **08/18/03** | | |
| | | | 757.05 | 7,242.95 | | 03/18/04 | 213 |
| | | | 7,242.95 | 0.00 | | 04/27/04 | 253 |
| | 04/27/04 | 10,755.19 | | **22,000.00** | **01/08/04** | | |
| | | | 3,512.24 | 18,487.76 | | 04/27/04 | 110 |
| | 06/30/04 | 2,438.25 | | 16,049.51 | | 06/30/04 | 174 |
| | 07/01/04 | 2,381.00 | | 13,668.51 | | 07/01/04 | 175 |
| | 07/14/04 | 7,440.80 | | 6,227.71 | | 07/14/04 | 188 |
| | | | 6,227.71 | 0.00 | | 08/31/04 | 236 |
| | 08/31/04 | 7,377.41 | | **27,519.73** | **01/31/04** | | |
| | | | 1,149.70 | 26,370.03 | | 08/31/04 | 213 |
| | 09/30/04 | 16,312.11 | | 10,057.92 | | 09/30/04 | 243 |
| | | | 10,057.92 | 0.00 | | 12/07/04 | 311 |
| | | | | **4,982.00** | **01/31/04** | | |
| | 12/17/04 | 25,000.00 | 4,982.00 | 0.00 | | 12/07/04 | 311 |
| | | | | **10,000.00** | **12/01/04** | | |
| | | | 9,960.08 | 39.92 | | 12/07/04 | 6 |
| | | | 39.92 | 0.00 | | 12/31/04 | 30 |
| 1 | 12/31/04 | 10,000.00 | | **25,000.00** | **12/16/04** | | |
| | | | 9,960.08 | 15,039.92 | | 12/31/04 | 15 |
| 2 | 01/07/05 | 15,000.00 | | 39.92 | | 01/07/05 | 22 |
| | | | 39.92 | 0.00 | | 02/18/05 | 64 |
| | | | | **15,000.00** | **12/29/04** | | |
| 3 | 02/18/05 | 40,000.00 | 15,000.00 | 0.00 | | 02/18/05 | 51 |
| | | | | **40,000.00** | **02/10/05** | | |
| | | | 24,960.08 | 15,039.92 | | 02/18/05 | 8 |
| | | | 15,039.92 | 0.00 | | 03/10/05 | 28 |
| 4 | 03/10/05 | 25,000.00 | | **25,000.00** | **03/01/05** | | |
| | | | 9,960.08 | 15,039.92 | | 03/10/05 | 9 |
| 5 | 05/31/05 | 2,689.70 | | 12,350.22 | | 05/31/05 | 91 |
| | | | 12,350.00 | 0.00 | | 07/15/05 | 136 |
| 6 | 07/15/05 | 18,000.00 | | **25,000.00** | **03/29/05** | | |
| | | | 5,649.78 | 19,350.22 | | 07/15/05 | 108 |
| 7 | 07/19/05 | 6,965.58 | | 12,384.64 | | 07/19/05 | 112 |
| 8 | 07/29/05 | 3,323.73 | | 9,060.91 | | 07/29/05 | 122 |
| | | | 9,060.91 | 0.00 | | 09/24/05 | 179 |
| 9 | 09/24/05 | 10,000.00 | | **18,000.00** | **05/24/05** | | |
| | | | 939.09 | 17,060.91 | | 09/24/05 | 123 |
| 10 | 10/14/05 | 10,000.00 | | 7,060.91 | | 10/14/05 | 143 |
| 11 | 11/08/05 | 20,000.00 | 7,060.91 | 0.00 | | 11/08/05 | 168 |
| | | | | **10,000.00** | **09/14/05** | | |

| Payment Number | Payment Date | Payment Amount | Split | Notes Receivable | Note Date | Payment Date | Time between Note & Payment (Days) |
|---|---|---|---|---|---|---|---|
| | | | 10,000.00 | 0.00 | | 11/08/05 | 55 |
| | | | | **20,000.00** | **10/05/05** | | |
| | | | 2,939.09 | 17,060.91 | | 11/08/05 | 34 |
| 12 | 11/14/05 | 5,360.60 | | 11,700.31 | | 11/14/05 | 40 |
| 13 | 11/28/05 | 3,060.49 | | 8,639.82 | | 11/28/05 | 54 |
| | | | 8,639.82 | 0.00 | | 11/30/05 | 56 |
| 14 | 11/30/05 | 25,000.00 | | **20,000.00** | **11/02/05** | | |
| | | | 16,360.18 | 3,639.82 | | 11/30/05 | 28 |
| 15 | 12/01/05 | 1,120.09 | | 2,519.73 | | 12/01/05 | 29 |
| | | | | **25,000.00** | **11/15/05** | | |
| | | | | 27,519.73 | | | |

As a preliminary matter, the court finds that the over forty-one month documented history (from June 28, 2001 to December 17, 2004) is sufficient to establish a course of dealings between the parties prior to the preference period.  Prior to the preference period, the average amount of the payments was $7,050.96, with a median of $3,097.58.  In the preference period, the average amount of the payments jumped 85 percent, to $13,034.68, with a median of $10,000.00.  Prior to the preference period, the average time between note and payment was 156 days, with a median of 136 days.  In the preference period, the average time between note and payment fell 48 percent, to 71 days, with a median of 55 days.  The court's findings are summarized in the tables that follow.

### ii.  Amount and Timing of the Payments

The court first examined the amounts of the payments.  Table 2 compares each preference period payment amount with the historical average amount.

*Table 2*

| Payment Number[11] | Payment Amount | Average Payment Amount (Historical Period) | Dollar Variance | Percentage Variance |
|---|---|---|---|---|
| 1 | $10,000.00 | $7,050.96 | $2,949.04 | 41.82% |
| 2 | $15,000.00 | " | $7,949.04 | 112.74% |
| 3 | $40,000.00 | " | $32,949.04 | 467.30% |
| 4 | $25,000.00 | " | $17,949.04 | 254.56% |
| 5 | N/A* | " | N/A | N/A |
| 6 | $18,000.00 | " | $10,949.04 | 155.28% |
| 7 | N/A* | " | N/A | N/A |
| 8 | $3,323.73 | " | -$3,727.23 | -52.86% |
| 9 | $10,000.00 | " | $2,949.04 | 41.82% |
| 10 | $10,000.00 | " | $2,949.04 | 41.82% |
| 11 | $20,000.00 | " | $12,949.04 | 183.65% |
| 12 | $5,360.60 | " | -$1,690.36 | -23.97% |
| 13 | $3,060.49 | " | -$3,990.47 | -56.59% |
| 14 | $25,000.00 | " | $17,949.04 | 254.56% |
| 15 | $1,120.09 | " | -$5,930.87 | -84.11% |

\* Not applicable.  The court does not consider payments 5 and 7, in the amounts of $2,689.70 and $6,965.58, as they were omitted from the parties' stipulation.

The court then examined the clustering of the payments.  As illustrated in Table 3 below, 26 percent of all the payments in the historical period clustered in the 0 to 60 day aging category while 44 percent of the payments were in the over 180 day category.

*Table 3*

|  | 0-60 Days | 61-90 Days | 91-120 Days | 121-150 Days | 151-180 Days | Over 180 Days |
|---|---|---|---|---|---|---|
| 41-Month Historical Period Payments | 15 | 5 | 8 | 1 | 3 | 25 |
|  | 26% | 9% | 14% | 2% | 5% | 44% |
| Preference Period Payments | 14 | 1 | 3 | 4 | 2 | 0 |
|  | 58% | 4% | 13% | 17% | 8% | 0% |

---

[11] "Payment Number" refers to the preference period payments identified in Table 1, *supra*.

A dramatic shift occurred from the historical period to the preference period.  In the preference period, 58 percent of the payments were clustered in the 0 to 60 day aging category while none were in the over 180 day category.

The court finally examined the timing of the individual payments.  Table 4 compares the time between note and payment in the preference period to the average time between note and payment in the historical period.  Unless otherwise noted, the time between note and payment during the preference period is the average age of the debt extinguished by the payment, rounded to the nearest day.

*Table 4*

| Payment Number[12] | Time between Note & Payment (Preference Period) | Time between Note & Payment (Historical Period) | Days Variance | Percentage Variance |
|---|---|---|---|---|
| 1 | 23 | 156 | -133 | -85.26% |
| 2 | 22* | " | -134 | -85.90% |
| 3 | 41 | " | -115 | -73.72% |
| 4 | 19 | " | -137 | -87.82% |
| 5 | N/A | " | N/A | N/A |
| 6 | 122 | " | -34 | -21.79% |
| 7 | N/A | " | N/A | N/A |
| 8 | 122* | " | -34 | -21.79% |
| 9 | 151 | " | -5 | -3.21% |
| 10 | 143* | " | -13 | -8.33% |
| 11 | 86 | " | -70 | -44.87% |
| 12 | 40* | " | -116 | -74.36% |
| 13 | 54* | " | -102 | -65.38% |
| 14 | 42 | " | -114 | -73.08% |
| 15 | 29* | " | -127 | -81.41% |

\* Actual age

Based upon the foregoing, the payments made during the preference period were significantly different, in amount and timing, from payments made prior to the preference period.

---

[12] "Payment Number" refers to the preference period payments identified in Table 1, *supra.*

### iii.  Remaining Factors

It does not appear that the Defendants undertook any collection activities, that the payments were made as a result of pressure from the Defendants, or that the Defendants engaged in any unusual debt collection practices.  The means of payment were similar during the preference period.  However, the payments made during the preference period were on average larger than those made during the pre-preference period.  They extinguished debt at an accelerated rate and did not fit within the prior course of dealings between the parties.  The debts were also atypical and wholly inconsistent with arm's length commercial transactions.  The court finds that given the unique facts surrounding the business relationship between BMC and TDC, there is a substantial likelihood that the parties undertook actions to substantially reduce TDC's notes receivable exposure to BMC just prior to and during the preference period.

The Defendants cite *In re BCE West* and *In re Lan Yik Foods Corp.* for the proposition that changes in average time of repayment alone do not negate an ordinary course of business defense.  The court is not persuaded by these cases.  In *In re BCE West*, the firm was hired for only one transaction.  *Smith v. Shearman & Sterling (In re BCE West)*, Adv. No. 00-00648, 2008 WL 565262, at *1 (Bankr. D. Ariz. Feb. 28, 2008).  Thus, there was no history between the firm and the debtor.  *See id.*  To establish a baseline of dealings between the firm and the debtor, the court looked to their respective practices when dealing with other similarly situated parties.  *Id.* at *2–3.  Based on a finding that the timing of the payments was consistent with past practices of the parties, the court determined that the payments were in the ordinary course of business of the parties.  *Id.* at *3–4.  In *In re Lan Yik Foods*, the court noted that "absolute consistency in actual or average payment dates is unrealistic and not required."  *McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185 B.R. 103, 113 (Bankr. E.D.N.Y. 1995).  The court found that the preference payment average of 110 days, which was on average 21 days later than the pre-

preference payments, was "not solely sufficient to show that the preference payments did not

follow the ordinary course of business established by these parties." *See id.* In this case, there

was an over forty-one month documented history of transactions between the parties. That

history reveals drastic changes in the amounts and timing of payments during the preference

period. The payments were accelerated by as much as 87 percent and were up to 467 percent

larger than the historical averages. Therefore, the payments were not consistent with the parties'

prior course of dealings.

Based upon the foregoing, the court finds that the Defendants have not established that

the debts and corresponding payments were made in the ordinary course of business between

TDC and BMC and, further, BMC has established that they were, in fact, not made in the

ordinary course of business.

### 2.  Subsequent New Value Defense

Having failed to prove that the payments fall within the ambit of § 547(c)(2), the

Defendants must rely on the "new value" defenses of §§ 547(c)(1) or (c)(4). In their argument,

the Defendants combine §§ 547(c)(1) and (c)(4). (Def.'s Post-Trial Mem. of Law 24.) To

prevail on a § 547(c)(1) defense, the Defendants have to prove: "(i) the transfer [was] for new

value given to the debtor; (ii) the transfer [was] intended to be a contemporaneous exchange; and

(iii) the transfer [was] in fact a substantially contemporaneous exchange." *See Buchwald Capital

Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 338 (Bankr. S.D.N.Y.

2006) (quoting *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S.

Relocation Servs., Inc. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 204

(Bankr.S.D.N.Y.2005)). Because § 547(c)(1) is framed in the conjunctive, the Defendants have

to prove all three elements. *See* 11 U.S.C. § 547(c)(1)(A)-(B). The Defendants failed to prove

the second and third elements. No testimony or evidence in the record establishes that BMC

intended the challenged payments to be contemporaneous exchanges for new value or that they were in fact contemporaneous exchanges for new value.

The court therefore turns to whether the transfers were for subsequent new value under § 547(c)(4). "The purpose of the new value exception, like that of the other § 547(c) exceptions, is to encourage creditors to continue to deal with troubled debtors without fear that they will have to disgorge payments received for value given." *Hall-Mark Elecs. Corp. v. Sims (In re Lee)*, 108 F.3d 239, 241 (9th Cir. 1997). Consistent with this purpose, § 547(c)(4) provides that a transfer to a creditor may not be avoided "to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor." 11 U.S.C. § 547(c)(4). In relevant part, "new value" means "money or money's worth in goods, services, or new credit." 11 U.S.C. § 547(a)(2).

To prevail on a § 547(c)(4) defense, the Defendants have to prove: (i) the creditor extended new value to the debtor after receiving the preference, (ii) the new value was unsecured, and (iii) the new value remains unpaid. *See Wolinsky v. Cent. Vt. Teachers Credit Union (In re Ford)*, 98 B.R. 669, 680 (Bankr. D. Vt. 1989) (collecting cases); *accord Savage & Assocs., P.C. v. Level(3) Commc'ns (In re Teligent, Inc.)*, 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004) ("A transferee, may, under § 547(c)(4), offset a preferential transfer to the extent he gave the debtor 'new value' after the date of the transfer, and the 'new value' remains unpaid."). The first two elements are not in dispute. At issue is whether the new value remains unpaid.

The "new value" upon which the Defendants rely was repaid. (Def.'s Post-Trial Mem. of Law 27–28; *see supra* Table 1.) The "new value" represented by notes in the amounts of $40,000.00, $25,000.00, $25,000.00, $18,000.00, $10,000.00, and $20,000.00 was repaid, respectively, by March 10, 2005, July 15, 2005, September 24, 2005, November 8, 2005,

November 8, 2005, and November 30, 2005.  The court lacks the requisite information to

determine whether the "new value" represented by the $20,000.00 note, on November 2, 2005,

and the $25,000.00 note, on November 15, 2005, remains unpaid.  The Defendants failed to

show that it does.  Therefore, none of the transfers are saved by the subsequent new value

defense.

### D.  Transferee Liability under 11 U.S.C. § 550

Avoidance and recovery of a preferential transfer are distinct concepts and processes.

*Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427 (6th Cir. 2003).  "An avoidance nullifies the

transfer.  As a result, the transferred property becomes a part of the estate automatically.  A

recovery, on the other hand, forces the transferee to return the property or become personally

liable for its value."  *Congress Credit Corp. v. AJC Int'l*, 186 B.R. 555, 558 (D.P.R. 1995).  The

purpose of § 550 is "to restore the estate to the financial condition it would have enjoyed if the

transfer had not occurred."  *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176

(Bankr. S.D.N.Y. 1998) (citations omitted).  Consistent with this purpose, § 550 identifies

persons from whom an avoided transfer may be recovered:

> (a) Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the
> trustee may recover, for the benefit of the estate, the property transferred, or, if the
> court so orders, the value of such property, from—
>> (1) the initial transferee of such transfer or the entity for whose benefit such
>> transfer was made; or
>> (2) any immediate or mediate transferee of such initial transferee.
>> . . . .
> (d) The trustee is entitled to only a single satisfaction under subsection (a) of this
> section.

11 U.S.C. § 550.  Thus, in addition to establishing the avoidability of the transfers in this case,

BMC must also establish a means of recovery under § 550(a), and "identify a specific category

of persons from whom recovery of the fraudulent transfer[s] may be had."  *See Sec. Investor*

*Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999).  BMC argues

that it can recover the transfers from TDC as an "initial transferee" and from Chorbajian as an

"immediate or mediate transferee" of the transfers.  Initial transferees are strictly liable for

recovery of preferentially transferred property.  *Carroll v. Tese-Milner (In re Red Dot Scenic,*

*Inc.)*, 351 F.3d 57, 58 (2d Cir. 2003) (citing 11 U.S.C. § 550(a)).  Immediate or mediate

transferees, however, may assert a good faith defense to recovery.  *Id.* (citing 11 U.S.C. §

550(b)).

        The first question is whether TDC is an initial transferee.  The Code does not define the

term "initial transferee."  The majority of the circuits, including the Second Circuit, apply the

"dominion and control" test set forth in *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890

(7th Cir. 1988).  *See Tese-Milner v. Brune (In re Red Dot Scenic, Inc.)*, 293 B.R. 116, 119

(S.D.N.Y. 2003) (citing *Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner,*

*Heine, Underberg, Manley, Myerson, & Casey)*, 130 F.3d 52, 57–58 (2d Cir.1997)), *aff'd*, 351

F.3d 57 (2d Cir. 2003).  To qualify as an "initial transferee," an entity must be more than a "mere

conduit" that facilitates the transfer between the debtor and a third party.  *In re Finley*, 130 F.3d

at 57–58.  The entity must exercise dominion over the transferred assets, or have the right to use

the assets for its own purposes.  *See id.* at 58.  Here, TDC received the challenged transfers

directly from BMC.  TDC could use the checks (or available cash resulting from the credits) as it

pleased.  Therefore, TDC is strictly liable as an initial transferee of the assets.

        The next question is whether Chorbajian is an immediate or mediate transferee.

Chorbajian was the sole member of TDC.  (Joint Stipulation of Facts ¶ 2.)  All profits from TDC

were distributed to Chorbajian.  (Joint Stipulation of Facts ¶ 3.)  Therefore, Chorbajian was the

immediate or subsequent transferee of the assets.

The final question is whether Chorbajian may disclaim liability under § 550(b).  BMC may not recover from Chorbajian if he took "for value, including satisfaction . . . of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." *See* 11 U.S.C. § 550(b)(1).  Chorbajian took for value because the challenged payments satisfied the prior advances.  *See id.*  At issue is whether Chorbajian took in good faith and without knowledge of the voidability of the transfer avoided.

The Code does not define "knowledge."  There is a split of authority on the level of knowledge required to impart liability on the recipient of a voidable transfer.  *Compare, e.g.*, *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 897–98 (7th Cir. 1988) ("the recipient of a voidable transfer may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate"), *IRS v. Nordic Village, Inc. (In re Nordic Village)*, 915 F.2d 1049, 1056 (6th Cir. 1990) (notation on check was "sufficient to place a reasonable person on notice that the transfer was illegitimate, and by extension, that it was voidable"), *rev'd on other grounds sub nom. United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992), *and Wasserman v. Bressman (In re Bressman)*, 327 F.3d 229, 236–37 (3d Cir. 2003) (quoting *Bonded*, 838 F.2d at 898), *with Smith v. Mixon*, 788 F.2d 229, 232 (4th Cir. 1986) ("Although 'knowledge' as used in § 550(b)(1) is not defined in the Code or in the legislative history, we conclude that it does not mean 'constructive notice.'").  In an unpublished opinion, the Second Circuit addressed the applicable standard as follows:

> "[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." . . . And, "[i]f a transferee possesses knowledge of facts that suggest a transfer may be fraudulent," he has sufficient knowledge to preclude his incantation of § 550(b)'s defense.

*Banner v. Kassow*, No. 96-5040, 1996 WL 680760, at *3 (2d Cir. Nov. 22, 1996) (summary order) (quoting *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355, 1357 (8th Cir.

1995)) (citing *Bonded*, 838 F.2d at 897–98).  Lower courts in this Circuit have similarly held that

inquiry notice of a debtor's possible insolvency suffices to impart liability.  *See Gallant v.*

*Kanterman (In re Kanterman)*, 97 B.R. 768, 779 (Bankr. S.D.N.Y. 1989); *Colmark I Ltd. P'ship*

*v. Graubard, Mollen, Horowitz, Pomeranz & Shapiro (In re Colmark I Ltd. P'ship)*, 189 B.R.

253, 258 (Bankr. D. Conn. 1995); *Genova v. Gottlieb (In re Orange County Sanitation, Inc.)*,

221 B.R. 323, 328–29 (Bankr. S.D.N.Y. 1997); *CNB Int'l, Inc. v. Kelleher (In re CNB Int'l,*

*Inc.)*, 393 B.R. 306, 330 (Bankr. W.D.N.Y. 2008).  This court agrees that "knowledge of

voidability" does not require "complete understanding of the facts and receipt of a lawyer's

opinion that such a transfer is voidable; some lesser knowledge will do."  *Bonded*, 838 F.2d at

898.  Knowledge, in this context, requires knowledge of "sufficient facts that (i) puts the

transferee on notice that the transfer might be avoidable or (ii) requires further inquiry into the

situation and such inquiry is likely to lead to the conclusion that the transfer might be avoidable."

*CNB Int'l, Inc.*, 393 B.R. at 330 (quoting *Mosier v. Goodwin (In re Goodwin)*, 115 B.R. 674, 677

(Bankr. C.D. Cal. 1990)).

    In this case, Chorbajian was intimately familiar with BMC's performance and knew of

BMC's financial difficulties at the time of the transfers.  Accordingly, he was not without

knowledge of the potential voidability of the transfers.  *See Grochocinski v. Knippen (In re*

*Knippen)*, 355 B.R. 710, 730 (Bankr. N.D. Ill. 2006) (holding that transferees failed to satisfy

element of defense where they were aware of debtor's financial problems at the time of transfer,

had lent money to debtor prior to transfer, and not all money had been repaid).  Therefore,

Chorbajian cannot disclaim liability under § 550(b).

    BMC has established that the transfers at issue here constitute preferential transfers under

§ 547(b).  The Defendants have not established that the exceptions found in § 547(c) apply to

these transfers.  As the initial transferee, TDC is strictly liable for recovery of the transferred

property.  As the immediate or mediate transferee, Chorbajian is also liable for recovery of the

transferred property.  Chorbajian failed to establish that he was a "good faith transferee" under

§ 550(b).  Therefore, BMC may recover the transfers from the Defendants in the amounts of

$10,000.00, $15,000.00, $40,000.00, $25,000.00, $18,000.00, $3,323.73, $10,000.00,

$10,000.00, $20,000.00, $5,360.60, $3060.49, $25,000.00, and $1,120.09, for a total of

$185,864.91.

### E.  Prejudgment Interest

There is no reference to prejudgment interest in the Code.  However, "courts have relied

on the word 'value' in § 550(a) as authorizing an interest award."  *Hechinger Inv. Co. v.

Universal Forrest Prods. (In re Hechinger Inv. Co.)*, 489 F.3d 568, 579 (3d Cir. 2007) (citation

omitted).  The court has discretion to award prejudgment interest.  *See id.* (citation omitted).  The

court also has discretion in selecting the appropriate rate of prejudgment interest.  *See Fendi

Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, No. 06 Civ. 85, 2010 WL 431509, at

*19 (S.D.N.Y. Feb. 8, 2010).  "Discretion must be exercised according to law, which means that

prejudgment interest should be awarded unless there is a sound reason not to do so."  *In re

Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997).  The award of prejudgment

interest "should be a function of (i) the need to fully compensate the wronged party for actual

damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the

remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed

relevant by the court."  *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec.

Workers, AFL-CIO*, 955 F.2d 831, 833–34 (2d Cir. 1992) (collecting cases).

BMC requests an award of prejudgment interest on the $185,864.91 at issue, accruing

from the dates of each preferential payment.  (Amended Complaint ¶¶ 128–33.)  Interest,

however, does not accrue from the dates the payments were made.  In this context, "interest

accrues from the date of the demand, or from the date of the commencement of the adversary

proceeding." *Barber v. Lebo (In re Indus. & Mun. Eng'g, Inc.)*, 127 B.R. 848, 851 (Bankr. C.D.

Ill. 1990).

> Interest does not run from the date of the preferential transfer, because the transfer
> is not improper in any respect at the time it occurs.  The determination of a
> preference and the recovery of the transfer under section 550 are based upon a
> subsequent event—the transferor's bankruptcy filing—and upon a [sic] analysis
> of the debtor's . . . bankruptcy (i.e., that the transferee would receive more if it
> retained the transfer than if the debtor's assets were liquidated).  Because the
> transfer is initially proper, and because there must be some affirmative decision
> made, supported by section 547(b), to recover the transfer, the consensus position
> is that prejudgment interest does not begin to accrue until some affirmative
> demand is made of the transferee to return the transfer.

*Breeden v. L.I. Bridge Fund L.L.C. (In re Bennett Funding Group, Inc.)*, Ch. 11 Case No. 96-

61376, Adv. No. 96-70280A, slip op. at 9 (Bankr. N.D.N.Y. Oct. 30, 1997) (quoting *In re Indus.*

*& Mun. Eng'g, Inc.*, 127 B.R. at 851).  "Absent proof of demand prior to the filing of the

adversary proceeding, interest will accrue on the date the action is filed." *Id.*  Here, there was no

proof of demand prior to the filing of the adversary proceeding.  Therefore, the court finds that

BMC is entitled to interest from February 13, 2007, the date it filed its original Complaint.  The

court now turns to the appropriate rate.

Under New York law, "in the absence of another applicable statute prescribing the

interest rate, judgments [are] assessed interest at a constant rate of 9 percent per annum from the

earliest date on which the cause of action existed through to payment of the judgment." *Fendi*,

2010 WL 431509, at *19 (citing N.Y. C.P.L.R. §§ 5001(b), 5004).

While no federal statute controls prejudgment interest, courts have found that the post-

judgment interest set forth in 28 U.S.C. § 1961 "is equally applicable to pre-judgment interest,

absent 'substantial evidence' showing 'that the equities of the particular case require a different

rate.'"  *See Jones v. UNUM Life Ins. Co.*, 223 F.3d 130, 139 (2d Cir. 2000); *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 1006 n.21 (Bankr. S.D.Oh. 1990) (citations omitted).  Pursuant to 28 U.S.C. § 1961, post-judgment interest on federal judgments is determined by the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a).  During the prejudgment interest period in this case, this weekly average yield fluctuated between a low of 0.27 percent per year (for the week ending November 27, 2009) and a high of 5.07 percent per year (week ending February 16, 2007).  *See* Federal Reserve Statistical Release Historical Data, http://www.federalreserve.gov/Releases/H15/ (follow "Historical Data" hyperlink; then follow "Weekly (Friday)" on the table under "Treasury bills constant maturity-1-year").  This weekly yield averaged approximately 1.94 percent per year during this period.  *See id.* (average of weekly rates for one-year constant-maturity nominal Treasury yield for the week ending February 16, 2007 through the week ending May 28, 2010, inclusive).  The federal postjudgment rate as of May 28, 2010 was 0.36 percent.  Post-Judgment Interest Rate, http://www.utd.uscourts.gov/documents/int2010.html (last visited June 7, 2010).

Balancing the equities, the court finds the 9 percent New York interest rate to be too high in this case.  *See Wickham*, 955 F.2d at 833–34.  The federal post-judgment rate is too low.  *See Jones*, 223 F.3d at 139 (noting that the suitability of post-judgment rate for an award of prejudgment interest depends "on the circumstances of the individual case, and the court need not limit the award of prejudgment interest to the rate at which the injured party would have lent money to the government").  In this case, "application of the relevant Treasury yield rate on the week preceding the entry of judgment would be particularly unjust because it is likely that

judgment will be entered at a point in time when the relevant Treasury yield rate is particularly

low." *See Fendi*, 2010 WL 431509, at *20. As observed in *Fendi*:

> Using the rate at one point in time to govern the entire period makes a good deal
> of sense in the context of post-judgment interest; it simplifies the calculation of
> what defendants owe, avoiding any further delay in payment of a judgment that
> might potentially be created by a complex calculation scheme involving a
> fluctuating rate. However, the need for simplification of calculations is less
> compelling in the context of prejudgment interest, where the relevant time period
> over which interest must be calculated is predetermined.

*Id.* In calculating interest over time periods encompassing various short-term rates, courts in this

Circuit have used a wide variety of formulas. *See id.* at *21 (citing *Del Turco v. Taylor Tile Co.*,

No. 03-CV-5543, 2007 WL 2581882, at *4 (E.D.N.Y. Aug. 6, 2007); *Bernstein v. Antar (In re

Crazy Eddie Sec. Litig.)*, 948 F. Supp. 1154, 1167 (E.D.N.Y. 1996) (observing that courts faced

with practical difficulties regarding calculation of prejudgment interest may choose any

reasonable method of calculation)). Based upon the foregoing, the court concludes that BMC is

entitled to reasonable interest at the average Treasury bill rate in effect from February 16, 2007

through the date of this Order. *See Breeden v. L.I. Bridge Fund L.L.C. (In re Bennett Funding

Group, Inc.)*, Ch. 11 Case No. 96-61376, Adv. No. 96-70280A, slip op. at 10 (Bankr. N.D.N.Y.

Oct. 30, 1997). BMC is entitled to prejudgment interest at a rate of 1.94 percent per year, and

post-judgment interest as calculated under the federal rate.

## II.     Fraudulent Conveyances

The Amended Complaint contains numerous allegations that certain alleged transfers by

BMC to TDC constitute transfers of assets of the debtor. The alleged transfers include: leasing

facilities at a below-market rate (¶¶ 32–37); providing management services (¶¶ 41–47) and

skilled labor for no profit (¶¶ 48–49); providing computer equipment (¶¶ 50–53), licensed

software  (¶¶ 54–57), internet access (¶¶ 58–60), and a phone system (¶¶ 61–63); providing

forklift warranty coverage (¶¶ 64–66); and providing parts and services for TDC's machinery and equipment (¶¶ 67–69).

The aforementioned alleged transfers of assets were said in the second cause of action to be fraudulent conveyances as described in 11 U.S.C. § 548 and DCL section 273, in the third cause of action to be fraudulent conveyances as described in 11 U.S.C. § 548 and DCL section 274, in the fourth cause of action to be fraudulent conveyances as described in 11 U.S.C. § 548 and DCL section 275, in the fifth cause of action to be fraudulent conveyances as described in 11 U.S.C. § 548 and DCL section 276, in the sixth cause of action to be fraudulent conveyances as described in 11 U.S.C. § 548 and DCL section 276-a, in the seventh cause of action to establish transferee liability of TDC pursuant to 11 U.S.C. § 550(a)(1), and in the eighth cause of action to establish transferee liability of defendant Chorbajian pursuant to 11 U.S.C. § 550(a)(2).

### A.  Applicable Standards

The New York Debtor and Creditor Law, and its analogous provisions in the Bankruptcy Code, protect against two kinds of fraudulent transfers: (1) transfers made with an actual intent to hinder, delay, or defraud; and (2) transfers which the law considers to be fraudulent, i.e., constructively fraudulent transfers.  BMC seeks to avoid and recover the allegedly fraudulent transfers (or the value thereof) pursuant to 11 U.S.C. §§ 544 and 550.  Section 544 allows certain transfers to be avoided under applicable state law.  *See* 11 U.S.C. §§ 544(b)(1).  The applicable state law is set forth in DCL sections 273, 274, 275, and 276.  Although not at issue in this case, New York Civil Practice Law and Rules 213(8) provides for a six year statute of limitations for actions based on fraud.  N.Y. C.P.L.R. § 213(8).

### 1. Actual Fraud

Pursuant to § 548(a)(1)(A), a transfer may be avoided as actually fraudulent if (1) the

debtor had an interest in the property transferred; (2) the transfer occurred within one year of the

petition date; and (3) the transfer was made with actual intent to hinder, delay or defraud a

creditor. *See* 11 U.S.C. § 548(a)(1)(A) (2004). While the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005 increased the reachback period from one year to two years,

§ 548(a)(1)(A) applies here only to transfers made within one year of the Petition Date.[13]

Pursuant to DCL section 276, "[e]very conveyance made and every obligation incurred

with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud

either present or future creditors, is fraudulent as to both present and future creditors." N.Y.

Debt. & Cred. Law § 276. In contrast to DCL sections 273 and 274, which permit the finding of

constructive fraud based on the lack of fair consideration, "section 276 focuses on the 'actual

intent' of the transacting parties." *United States v. McCombs*, 30 F.3d 310, 327 (2d Cir. 1994).

Proof of intent to defraud is not required; rather, proof of intent to hinder or delay creditors will

suffice. *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390,

403 (Bankr. S.D.N.Y. 2007) (citations omitted). "Since the question of actual fraud involves the

parties' state of mind, it is not ordinarily proven by direct evidence, but rather, by inference from

other facts proven." *McCarthy v. Nandalall (In re Nandalall)*, Ch. 7 Case No. 06-12252, Adv.

No. 08-90118, 2010 WL 1780048, at *5 (Bankr. N.D.N.Y. May 3, 2010) (quoting *Adams v.

Zembko (In re Zembko)*, 367 B.R. 253, 256 (Bankr. D. Conn. 2007)). "Due to the difficulty of

proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on

---

[13] "The two-year period applies to cases commenced more than one year after the enactment of BAPCPA, that is, after April 20, 2006." *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 661 n.5 (Bankr. E.D.N.Y. 2008); Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, §§ 1402(1), 1406(b)(2), 119 Stat. 23, 214, 215–16 (2005). BMC's bankruptcy case was filed on December 27, 2005, so the applicable reachback period is one year.

'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (internal quotation marks and citations omitted). Circumstances recognized by the Second Circuit as "badges of fraud" include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Nandalall*, 2010 WL 1780048, at *6 (citation omitted). As the party seeking to set aside the transfers, BMC bears the burden of proving actual intent to hinder, delay, or defraud creditors, which it must do by clear and convincing evidence. *McCombs*, 30 F.3d at 328. "It is the intent of the transferor and not that of the transferee that is dispositive. . . . The intent of the transferee only becomes relevant as an affirmative defense if the defendant is not the initial transferee." *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999) (citations omitted). Once intent is proven, a transfer will be set aside as fraudulent regardless of the adequacy of the consideration. *McCombs*, 30 F.3d 310 at 328.

## 2. Constructive Fraud

Pursuant to § 548(a)(1)(B), a transfer may be avoided as constructively fraudulent if "(1) the debtor had an interest in the property transferred; (2) the transfer occurred within one year of the petition date; (3) the debtor was insolvent at the time of the transfer or became insolvent as result of it; and (4) the debtor received less than a reasonably equivalent value in exchange for the transfer." *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Group, Inc.)*, 232 B.R.

565, 570 (Bankr. N.D.N.Y. 1999) (citations omitted).  Section 548(a)(1)(B) applies here only to

transfers made within one year of the Petition Date while the debtor was insolvent.  *See supra*

note 13 and accompanying text.

Pursuant to DCL sections 273, 274, and 275, a conveyance by a debtor is deemed

constructively fraudulent if it is made without "fair consideration," and one of the following

conditions is met:

> (i) the transferor is insolvent or will be rendered insolvent by the transfer in
> question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a
> business transaction for which its remaining property constitutes unreasonably
> small capital, DCL § 274; or (iii) the transferor believes that it will incur debt
> beyond its ability to pay, DCL § 275.

*Sharp Int'l Co. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir.

2005) (citing N.Y. Debt. & Cred. Law §§ 273–75).  An essential element of a constructive fraud

claim is lack of fair consideration.  *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 248 (2d

Cir. 1987).  Under the DCL, fair consideration is given for property, or obligation:

> a. When in exchange for such property, or obligation, as a fair equivalent therefor,
> and in good faith, property is conveyed or an antecedent debt is satisfied, or

> b. When such property, or obligation is received in good faith to secure a present
> advance or antecedent debt in amount not disproportionately small as compared
> with the value of the property, or obligation obtained.

N.Y. Debt. & Cred. Law § 272.  "As the language of the statute suggests, the concept of fair

consideration has two components—the exchange of fair value and good faith—and both are

required."  *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376–77 (S.D.N.Y. 2003).  Good faith is

an elusive concept, hard to locate "in a statute in which 'the issue of intent is irrelevant.'"  *In re*

*Sharp Int'l Corp.*, 403 F.3d at 54 (quoting *United States v. McCombs*, 30 F.3d 310, 326 n.1 (2d

Cir. 1994)).  Nevertheless, the Second Circuit expressed the "good faith" standard as follows:

"where . . . a transferee has given equivalent value in exchange for the debtor's property, the

statutory requirement of 'good faith' is satisfied if the transferee acted without either actual or

constructive knowledge of any fraudulent scheme." *HBE Leasing Corp. v. Frank*, 48 F.3d 623,

636 (2d Cir. 1995). As the party seeking to set aside the transfers, BMC bears the burden of

proving the elements of constructive fraud, which it must do by a preponderance of the evidence.

*See Lippe*, 249 F. Supp. 2d at 376.

### B. BMC's Claims

The court finds that BMC failed to prove that the alleged transfers were made with actual

intent to hinder, delay, or defraud creditors. Each of the transfers was made in accordance with

the contractual or longstanding relationship between the parties. None were made with the intent

to place assets beyond the reach of creditors. The court considered all of the facts outlined in

BMC's post-trial submissions and found them unpersuasive as badges of fraud in the context of

this case. (*See* Pl.'s Post-Trial Mem. of Law (No. 131) 11–12; Pl.'s Reply Mem. of Law (No.

137) 47–48.) While the parties did enjoy a close relationship and BMC was insolvent, the court

does not accept these few and belabored indicia as sufficient evidence of actual fraud. The

focus, instead, is on constructive fraud. Resolution of BMC's constructive fraud claims turns on

the value of the allegedly transferred assets and the consideration received in exchange for those

assets. In its January 15, 2009 Judgment on Partial Findings, the court dismissed BMC's

fraudulent conveyance claims as regards the provision of managerial services and the subletting

of 8,000 square feet of space at a below-market rate. (No. 104.) The court now addresses

BMC's remaining claims.

### 1. The Provision of Skilled Labor by BMC to TDC

The parties had an agreement whereby BMC provided labor and services to TDC.

(Def.'s Ex. E.) BMC employees kept time cards for work they performed for TDC. (Trial Tr.

vol. 2, 118:23-120:2, Oct. 6, 2008.) BMC charged TDC an hourly rate for the use of BMC

employees; the rate included wages and benefits.  (Trial Tr. vol. 5, 34:12-24, Nov. 26, 2008; Pl.'s

Ex. 65; Def.'s Ex. U; Def.'s Ex. E.)  Pursuant to the agreement, TDC paid BMC for the labor and

services provided to TDC.  (Def.'s Ex. E; Pl.'s Ex. 65.)  There is no evidence that TDC failed to

adequately compensate BMC.  The court gives no weight to Dufresne's assertions to the

contrary.  (Trial Tr. vol. 1, 151:18-154:11, Oct. 3, 2008.)  TDC paid BMC a markup on the labor

and services.  (*See* Trial Tr. vol. 1, 153:5-9, Oct. 3, 2008.)  Dufresne provided no credible basis

for his opinion that the markup here was too low, or that a markup "of 20 to 25 percent on top of

the direct wage, would have been an appropriate markup."  (*See* Trial Tr. vol. 1, 152:22-24, Oct.

3, 2008.)  In addition, Dufresne alluded to skilled labor, in the form of engineering time, which

was not charged to TDC.  (Trial Tr. vol. 1, 104:7-12, 105:18-107:16, Oct. 3, 2008.)  There is no

basis for apportioning an amount of engineering labor to TDC.  The engineers never kept time

cards.  (Trial Tr. vol. 1, 107:21-108:2, Oct. 3, 2008; Trial Tr. vol. 2, 73:5-11, Oct. 6, 2008.)

There is no record of how much time was spent on work for TDC.  (Trial Tr. vol. 1, 107:21-

108:11, Oct. 3, 2008; Trial Tr. vol. 2, 76:14-77:15, Oct. 6, 2008.)  Therefore, the court dismisses

those portions of BMC's second through eighth causes of action, insofar as they concern the

provision of skilled labor by BMC to TDC.

### 2.   The Provision of Computing Services by BMC to TDC

BMC and TDC shared computers.  BMC called a computer expert, Henderson, to testify

as to the value of computing services allegedly provided by BMC to TDC.  Exercising its

gatekeeper function, the court excluded Henderson's report and testimony on the basis that his

opinion was unsupported by analysis and thus unreliable.  (No. 51; Trial Tr. vol. 2, 209:20-

215:19, Oct. 6, 2008.)  *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137

(1999); *Segal v. Addus Healthcare, Inc. (In re Med Diversified, Inc.)*, 334 B.R. 89, 95 (Bankr.

E.D.N.Y. 2005).  BMC also pointed to three invoices from computer consultants who performed

work for TDC in 2006 and 2007.  (Trial Tr. vol. 6, 38:23-39:15, Dec. 3, 2008; Def.'s Exs. BB,

CC, DD.)  The court gives little weight to these exhibits because they bear no connection to the

value of services actually provided by BMC to TDC during the relevant time period.  BMC

failed to introduce sufficient evidence to establish the value of the computing services.

Therefore, the court dismisses those portions of BMC's second through eighth causes of action,

insofar as they concern the provision of computing services by BMC to TDC.

### 3.    The Provision of Licensed Software by BMC to TDC

BMC and TDC shared Microsoft Office and QuickBooks, as well as manufacturing and

e-mail software.  BMC introduced no evidence to value the software.  There is no evidence that

TDC failed to adequately compensate BMC for the use of the software.  Therefore, the court

dismisses those portions of BMC's second through eighth causes of action, insofar as they

concern the provision of licensed software by BMC to TDC.

### 4.    The Provision of Internet Service by BMC to TDC

The Amended Complaint alleges that "TDC did not pay Bruno Machinery for access to

the internet or contribute toward Bruno Machinery's costs associated with obtaining internet

access."  (Amended Complaint ¶ 59.)  TDC paid BMC $30 per month for internet access.  (Joint

Stipulation of Facts ¶ 22; Trial Tr. vol. 1, 121:7-122:24, Oct. 3, 2008.)  Therefore, the court

dismisses those portions of BMC's second through eighth causes of action, insofar as they

concern the provision of internet service by BMC to TDC.

### 5.    The Provision of a Phone System by BMC to TDC

BMC introduced no evidence to value the phone system.  (Trial Tr. vol. 6, 42:6-43:13,

Dec. 3, 2008.)  Therefore, the court dismisses those portions of BMC's second through eighth

causes of action, insofar as they concern the provision of a phone system by BMC to TDC.

### 6.    The Provision of Forklift Warranty Coverage by BMC to TDC

BMC introduced no evidence to value the forklift warranty coverage.  The only reference

was to a $3,000 invoice from a forklift service company, which BMC refused to pay.  (Trial Tr.

vol. 2, 152:10-21, 118:7-12, 67:1-68:21, Oct. 6, 2008.)  Therefore, the court dismisses those

portions of BMC's second through eighth causes of action, insofar as they concern the provision

of forklift warranty coverage by BMC to TDC.

### 7.    The Provision of Parts and Services by BMC to TDC

BMC introduced no evidence that TDC failed to adequately compensate BMC for the

provision of parts and services.  (Trial Tr. vol. 1, 119:8-120:5, 121:9-12, Oct. 3, 2008; *e.g.* Def.'s

Ex. T, at 260.)  Therefore, the court dismisses those portions of BMC's second through eighth

causes of action, insofar as they concern the provision of parts and services by BMC to TDC.

### CONCLUSION

Based upon the foregoing, it is hereby

ORDERED on the first cause of action, pursuant to 11 U.S.C. § 547, judgment is

rendered in favor of BMC in the amount of $185,864.91; and it is further

ORDERED that the second, third, fourth, fifth, and sixth causes of action, pursuant to 11

U.S.C. § 548 and New York Debtor & Creditor Law sections 273–276-a, are hereby dismissed in

their entirety; and it is further

ORDERED on the seventh and eighth causes of action, pursuant to 11 U.S.C. §§

550(a)(1) and (a)(2), judgment is rendered in favor of BMC, and the Defendants are ordered to

turn over to the BMC for the benefit of creditors the sum of $185,864.91 for which they were

found to be liable in the First Cause of Action; and it is further

ORDERED that on the ninth cause of action, pursuant to 11 U.S.C. § 547, BMC is

entitled to prejudgment interest at a rate of 1.94 percent per year, running from the date of the

commencement of this action, and post-judgment interest as calculated under the federal rate.

s/s Robert E. Littlefield, Jr.

Dated: June 9, 2010

_____
Hon. Robert E. Littlefield, Jr.
Chief United States Bankruptcy Judge